[Civ. No. 4336. Fifth Dist. Dec. 29, 1978.]

CARL LEE JAMES, Petitioner, v.
THE SUPERIOR COURT OF TULARE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Walter L. Gorelick, Public Defender, Gerald F. Sevier, Assistant Public Defender, and Jesse J. Avila, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller, Charles P. Just and Charles J. James, Deputy Attorneys General, for Real Party in Interest.

**OPINION**

**HOPPER, J.**—Petitioner (James) seeks a writ to suppress certain evidence seized at the time of an arrest.

In this case the main issue we consider is the validity of a warrantless arrest of petitioner.

## FACTS

On May 30, 1978, Virginia Ann Fierro and Rosanna Limon were employed and working at Jiffy Food Store, Blackstone and Alpine Streets, Tulare. Shortly after midnight two black men entered the premises and pretended to buy a bottle of wine. The person subsequently identified as James selected a bottle of wine and put it on the counter; Miss Fierro put the wine in a bag and asked James for payment. James "just stood there" and then grabbed the package of wine and proceeded to the cash register where his companion was located. James' companion asked for a package of "Kool" brand cigarettes and James then pushed the wine bottle into Miss Fierro's stomach and told her to "back off" and at the same time his companion picked up a container of boiling water and threatened Miss Limon with it and told her to open the cash register and put the money in a bag. Miss Limon refused to do this, but the robbers took the money from the cash register (the bills); then from the top part of the safe they took two bags: one of coins and one of "money." Both of the store employees recognized James as a customer of the store and Miss Fierro knew him by his nickname of "Fish."

After the robbers left, Miss Limon pressed the alarm button and the officers arrived in about three minutes. Fierro and Limon described the robbers to the officers by physical description, clothing worn, one as a customer of the store, and Fierro recognized James as "Fish."

Dan J. Gholson, a sergeant with the Tulare Police Department, responded to the Jiffy Food Store and contacted the clerks, Fierro and Limon. They advised him that two male adults had committed the robbery, one using a bottle of wine and the other a pot of hot water, and had fled the scene on foot. A description was provided as to clothing and James' nickname of "Fish" and that he was wearing a blue and yellow tank top and a pair of blue slack-type trousers and an earring, post type. He was advised also that approximately $80 to $100 in cash had been stolen, in currency, and a package of "Kool" cigarettes. Officer Hennemann of the Tulare Police Department was assisting in this investigation, and upon being advised of the description of the suspects, checked the surrounding area without success. He contacted a "reliable confidential informant" concerning the nickname "Fish" and obtained "a possible name" and location to go with that nickname. This information was relayed to Sergeant Gholson and the sergeant and Officer Hennemann then went to the police department and prepared a mugshot lineup. Both victims identified petitioner as one of the two robbers. The police had an

address of the Morris Inn for this suspect, and at the time the victims identified petitioner from the photo lineup, Officer Hennemann was in that vicinity. Sergeant Gholson proceeded to that location. Sergeant Gholson also directed other officers to that location and approximately four or five officers were there. At the time the officers arrived at this motel it was approximately 1:44 a.m. The police did not obtain either an arrest warrant or a search warrant. There was testimony that it would have taken between six and eight hours to get these warrants.

Sergeant Gholson and Officer Hennemann proceeded to James' apartment; the other officers were directed to the rear of the building. Hennemann knocked on the door several times and stated in a loud voice that he was a police officer. Rummaging could be heard from inside the room and after several moments petitioner opened the door "just a little bit." Hennemann asked, "Are you Carl?" and James responded, "Yes, Carl James." Officer Hennemann was aware of the strong-arm nature of the robbery that had just occurred and he was also aware of information concerning threats of armed robbery in convenience stores and threats to kill proprietors received by the police department. As he was talking to James, Hennemann noticed an earring in his ear matching the description given by the victims. After noticing the earring, Hennemann told James to step into the hall, that he wanted to talk to him. James did not comply. Sergeant Gholson told Hennemann that this was the man they were looking for and at that point Officer Hennemann decided to arrest James. Hennemann took hold of James' arm and pulled him out into the hallway and effected the arrest.

At the time of arrest, James was clothed only in some undershorts. He stated, "At least let me get some pants." Hennemann asked if his clothes were in his room and James replied they were. So James and the two officers went into the room. Sergeant Gholson turned on the lights and they entered the room, and while in the room, observed the items of evidence here in question consisting of a package of "Kool" cigarettes on a table, a yellow and blue tank top, a pair of blue plaid pants and a pair of blue denim pants. After the light was turned on, these items were all in plain view inside the room.[1]

The yellow and blue tank top requested by James from his room was identified by the victims as the garment worn during the robbery by James. The bundle of money removed from the pair of pants found in the

---

[1] James was not permitted to put on any clothes until he got to the police station.

room was identified as consisting of two $10 bills, four $5 bills and the balance in $1 bills, in the total amount of $87.

## DISCUSSION

 James contends that his warrantless arrest was in violation of *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333]. In *Ramey* our Supreme Court held that warrantless arrests within the home are per se unreasonable in the absence of exigent circumstances (*People* v. *Ramey, supra,* at p. 276).[2]

Real party contends that *Ramey* is inapplicable as being factually distinguishable and that, even if applicable, there were exigent circumstances.

Real party argues that probable cause to arrest did not arise here until James answered the door; that unlike *Ramey* where the arrest was made for a different crime than that for which the officers went to the residence, here everything in that respect was consistent; that there is a duty to submit to a reasonable detention and that the time involved in *Ramey* was much longer than here.

We disagree on the matter of probable cause. We believe that the record demonstrates that when the officers went to the apartment they had probable cause to arrest James and knew that James was then in the apartment. (For a case in which probable cause seemingly did not arise until arrival at the residence, see *People* v. *Superior Court (Godwin)* (1977) 68 Cal.App.3d 780 [137 Cal.Rptr. 586].) Reliance by real party on *People* v. *James* (1977) 19 Cal.3d 99 [137 Cal.Rptr. 447, 561 P.2d 1135] as being a case where a defendant did not prevail on a warrantless arrest even though there was probable cause to arrest is misplaced. *James* was decided after *Ramey,* but the arrest in *James* was before *Ramey* and therefore *Ramey,* by its very terms, was inapplicable. (". . . the rule we now adopt will apply only to arrests made after this opinion becomes final." (*Ramey,* 16 Cal.3d at p. 276, fn. 7).)

Counsel for real party acknowledged at oral argument that he was unable to cite any case authority for the proposition that petitioner was under a duty to submit to reasonable detention. We decline to find such a duty in this case.

---

[2] Robbery per se is not an additional exception. (See *Mincey* v. *Arizona* (1978) 437 U.S. 385 [57 L.Ed.2d 290, 98 S.Ct. 2408, 2412-2413] holding that there is no additional exception for the search of a murder scene.)

Nor are we persuaded by the other contentions of real party on the inapplicability of *Ramey.*

■ We, therefore, turn to the question of exigent circumstances. Exigent circumstances are defined as follows: ". . . 'exigent circumstances' means an emergency situation requiring *swift action* to prevent *imminent* danger to life or serious damage to property, or to forestall the *imminent* escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (Italics added.) (*People* v. *Ramey, supra,* at p. 276.)

A key word in this definition is "imminent." "Imminent" means: "impending"; "about to happen"; "immediate"; "threatening"; "ready to take place"; "near at hand"; all to the extent that the event in question will occur at once unless speedy, swift and prompt police action to arrest is forthcoming.

Examining the facts in this case in the light of *Ramey,* we conclude that the People did not meet the burden of demonstrating exigent circumstances.

First, the instant case is not one where the police were in hot pursuit. (See *People* v. *Sanchez* (1978) 86 Cal.App.3d Supp. 8 [150 Cal.Rptr. 772]; see also *People* v. *Mack* (1977) 66 Cal.App.3d 839 [136 Cal.Rptr. 283] (a rearrest in a pre-*Ramey* case).)

Second, while every arrest involves a risk to the arresting officer, there is insufficient showing here that there was imminent danger to human life. While Officer Hennemann assumed that James could be armed because of previous armed robberies in the area, both Officers Brantley and Hennemann felt that James was not armed in the conventional use of the term, i.e., with a firearm or knife. The items used in this robbery, a container of boiling water and a wine bottle, both discarded or abandoned upon the flight of the suspects, did not fall within the framework of one of *Ramey's* exigent circumstances.

■■ ■■ Third, although argued vigorously by the Attorney General, there was no showing that escape was imminent in this case. In one sense real party's argument begs the question. Real party argues that if one of the officers had gone to obtain a warrant, that escape would have been facilitated during the absence of the officer. This may be true, but the argument rests upon an assumption with which we disagree, i.e., that probable cause to arrest did not exist until the officers saw James at the door. Whenever the People rely on the limited exceptions set forth in *Ramey,* the prosecution must be able to point to specific and articulable facts that reasonably justify the conclusion that the exigent circumstance relied upon for the warrantless arrest is imminent. To hold otherwise would permit the exception to swallow the rule. As previously indicated, we conclude that there was probable cause to arrest when the officers went to the apartment. There is nothing in the record to indicate that James was preparing to escape before the door was opened. Thus, the warrant could have been obtained before James even opened the door. Certainly the "imminent" escape which would authorize a warrantless arrest cannot be created by the officer alerting the suspect to the fact of the presence of the officer. From all the circumstances in this case, it appears that James thought that he had successfully evaded capture and had, therefore, gone to bed with little, if any, effort to escape. Simply stated, there were no specific or articulable facts suggesting that escape was about to take place. The evidence is to the contrary. James was in his underclothes. He had already had sufficient time from the commission of the crime to flee. There is no suggestion from the record that there was a strong reason for believing that an attempted escape of James was near at hand and would take place unless James was swiftly apprehended.

Fourth, there was no imminent danger of destruction of evidence. There is very little in the record before us to indicate that the police made a warrantless arrest to prevent destruction of evidence.[3] Additionally, there is no showing that James had been warned of the police interest in him which might have spurred him on to take steps to destroy

---

[3]The only portion of the record so indicating is found in the redirect examination of Officer Hennemann which reads:

"Q. Was part of your desire in making a speedy arrest, besides protection of the public in general, to prevent a destruction of evidence?
"A. Was that also a reason?
"Q. Uh-huh, was it?
"A. Well, yes, seeing how the evidence or the property taken was money, yes, but that wasn't the main reason.
"Q. Just a reason?
"A. That was one of the reasons, yes."

incriminating evidence. Here the element of time itself runs contrary to any contention of imminent destruction of the evidence. If James was going to destroy the money, the clothes worn during the commission of the crime and the pack of cigarettes, he had more than adequate time to do so before the arrival of the police. If James was not going to destroy the items, then he had gone to sleep and the possible destruction was not imminent. In either event, swift action to forestall imminent destruction of possible evidence was not necessary. The prosecution has not pointed to specific and articulable facts that reasonably justify the conclusion that the destruction of evidence was imminent. Many crimes involve either items taken by the perpetrator or some kind of physical evidence, or both. ■ An objective evaluation of the facts articulable by the police that destruction of evidence is imminent is required to support exigent circumstances.

■ There was no attempt to obtain either an arrest or search warrant in this case. The evidence suggests that it might have been as late as noon the following day before a warrant could be completed and signed. We recognize that there may be practical considerations making the obtaining of a warrant in a nonmetropolitan area more difficult than in a metropolitan area. However, the favored approach under our system of justice is to obtain a warrant. We are unable to understand why issuance should be so time-consuming. Arrest warrants for felonies are issued under Penal Code sections 813-816. Arguably, there may even be a difference between a "probable cause complaint" sufficient to obtain a warrant and a complaint which initiates criminal proceedings against the accused. (See Comment, *The Legal Efficacy Of Probable Cause Complaints In Light Of People v. Ramey* (1977) 13 Cal. Western L.Rev. 456; *People* v. *Sesslin* (1968) 68 Cal.2d 418, 425, fn. 6 [67 Cal.Rptr. 409, 439 P.2d 321].) In any event, we reject any view that excuses the seeking of a warrant because the hour is late and there may be difficulty in finding a judge to issue a warrant. As the federal Court of Appeals stated in *United States* v. *Bozada* (8th Cir. 1973) 473 F.2d 389, 394-395, cert. den. (1973) 411 U.S. 969 [36 L.Ed.2d 691, 93 S.Ct. 2161]: "If the processes of our government are such that police officers are unable to secure search warrants outside of ordinary business hours, then the cure for that problem is not to sacrifice the Fourth Amendment rights of our citizens, but to streamline the warrant procuring procedure." The California Legislature has streamlined the procedure by providing for the issuance of a search warrant by an oral statement under oath in lieu of a written affidavit (Pen. Code, § 1526, subd. (b)). A similar provision for an arrest warrant (giving full consideration to the duties and responsibilities of the

district attorney to institute criminal proceedings) might be helpful. Furthermore, present legislation provides that a magistrate shall be available after business hours. Penal Code section 810, subdivision (a), provides: "The presiding judge of the superior court, the presiding judge of each municipal court in a county, and the judge of each justice court in a county, shall, as often as is necessary, meet and designate on a schedule not less than one judge of the superior court, municipal court or justice court to be reasonably available on call as a magistrate for the . . . issuance of search warrants, and for such other matters as may by the magistrate be deemed appropriate, at all times when a court is not in session in the county."

While we all deplore the growing crime rate, we also recognize that the right of officers to enter a residence is of grave concern to a society in which the right to privacy is placed on a high pedestal. The California and United States Constitutions require the "dispassionate judgment of a magistrate" to adequately protect the right to privacy. (*People* v. *Ramey, supra,* 16 Cal.3d at p. 275; U.S. Const., 4th Amend.; Cal. Const., art. I, § 13.)

We see no reason why in this case, rather than initially going to the door, the police could not have sent one of their members (or called in for assistance) to obtain a warrant while the other officers remained at the premises ready to arrest James if he left the apartment before the warrant was issued. *Ramey,* of course, does not prohibit a warrantless arrest outside of the residence.

We wish to make it clear that this holding does not preclude a warrantless arrest in a residence under either of the following circumstances, neither of which exists in this case:

1. Where robbers are armed with deadly weapons when they leave the scene of a robbery and presumably still have those weapons at their residence. Such conditions come within the exigent circumstances described in *Ramey.*

2. Where the officers do not clearly have probable cause to arrest and the officers approach the residence to further obtain such probable cause and such probable cause then arises after the suspect opens the door and refuses to come out. Under such conditions the police may then enter to prevent the imminent destruction of evidence triggered by the realization of the suspect that the police are there.

Considering the totality of the circumstances, there were no exigencies permitting the warrantless arrest in this case. ▮ Because the consent to enter the room was inextricably entwined with the warrantless arrest, that entry cannot be validly based on consent.

For the reasons set forth above, the motion to suppress should have been granted and a writ of mandate should issue. Such a ruling, of course, does not in any way prohibit the prosecution of James on the robbery charges (and it is for this reason we issued the alternative writ). The prosecution is not precluded from relying on the identification evidence.

Let a writ of mandate issue ordering the respondent superior court to vacate its previous order and enter a new and different order suppressing the evidence seized, to wit, the clothing, the money, and the cigarettes.

The alternative writ is discharged.

The stay order heretofore issued by this court shall remain in force until this decision is final in all courts or the Supreme Court grants a hearing herein, whichever may first occur.

Brown (G. A.), P. J., and Franson, J., concurred.

A petition for a rehearing was denied January 23, 1979, and the opinion was modified to read as printed above.