[Crim. No. 42984. Second Dist., Div. Four. Nov. 7, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE ALEXANDER KELTIE, Defendant and Appellant.

**COUNSEL**

Allan M. Rosenthal, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Howard J. Schwab and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KINGSLEY, Acting P. J.**—Defendant was charged with: (count I) vehicular manslaughter in violation of Penal Code section 192, subd. 3(a); (count II) felony hit and run in violation of Vehicle Code section 20001; and (count III) felony driving under the influence in violation of Vehicle Code section 23101. Trial was by jury. The jury returned formal verdicts of conviction in counts II and III but declared some disagreement as to count I. After polling the jurors, the trial court found defendant guilty as charged in count I and further found that the count I offense was committed with at least ordinary negligence. Proceedings were suspended and defendant placed on probation under the condition that he serve nine months in county jail.

On this appeal from the judgment of conviction, we reverse the conviction on count I, affirm the convictions on counts II and III, and remand the case for resentencing.

At approximately 10 p.m., on August 14, 1981, Yoko Toda was struck and killed by a car on Beverly Glen Boulevard. No one saw the accident, but several people looked out of their windows upon hearing the impact, and saw defendant's van and a sports car stopped parallel to each other in the two north-bound lanes. The van was in the right lane, near where Ms. Toda lay by the curb. The driver of the van was seen to briefly exit his vehicle, then drive it away. One witness, a Mr. Credle, identified the driver as defendant.

About an hour later, investigating officers came upon defendant's van parked in his driveway a few blocks from the accident scene. The right side of the exterior was damaged, and smeared with blood and human tissue. The officers entered defendant's home, found him visibly intoxicated, and arrested him. At 12:48 a.m., his blood-alcohol level was measured at .24 percent.

The defense theory was that defendant was at home during the accident and that someone else had driven his van. It was defendant's habit to leave the car keys inside the van, and due to a malfunction of the driver door, anyone could have entered and operated it. Defendant also challenged Mr. Credle's ability to identify him as the driver, given the distance involved and the darkness of the street.

I

In a pretrial motion to suppress evidence, defendant challenged the lawfulness of his arrest. The trial court ruled that the arrest, conducted in defendant's home without a warrant, was justified by exigent circumstances and possibly by the doctrine of hot pursuit. Defendant challenges this ruling on appeal, contending that no emergency existed that would excuse the officers' failure to obtain a warrant before entering the home. We agree that the warrantless entry cannot be justified on the theory of hot pursuit, but find that the trial court was correct in ruling it justified by the officers' need to preserve evidence from imminent destruction.

■ It is well settled that the Fourth Amendment to the federal Constitution and article I, section 13 of the California Constitution apply to arrests within the home, and that warrantless arrests conducted in the home are therefore unlawful in the absence of exigent circumstances. (*People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333].) "In this

context, 'exigent circumstances' mean an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*Id.*, at p. 276.)

■ The necessity to forestall imminent escape of a suspect is known as the "hot pursuit" exception to the warrant requirement. This exception applies in situations where the delay occasioned by obtaining a warrant would permit the escape of a suspect in a "grave offense" who remains "dangerous to life and limb." (*People* v. *Escudero* (1979) 23 Cal.3d 800 [153 Cal.Rptr. 825, 592 P.2d 312]; *People* v. *Smith* (1966) 63 Cal.2d 779, 797 [48 Cal.Rptr. 382, 409 P.2d 222].) It does not apply where the suspect poses no imminent danger if allowed to temporarily remain at large. (*James* v. *Superior Court* (1978) 87 Cal.App.3d 985 [151 Cal.Rptr. 270].) ■ We think it plainly apparent that a person suspected of an alcohol-related driving offense poses no imminent danger to life and limb once he is separated from his vehicle. Hence, the officers' entry into appellant's home could not be justified on the theory of hot pursuit.

The need to preserve evidence from imminent destruction is another matter. If such a need is shown with sufficient certainty, then police need not risk losing important evidence while obtaining a warrant. Although our research discloses no cases in point, we think this rationale applies to the situation at bar.

■ In order to justify a warrantless home arrest on this ground, the police must point to something more than a generalized fear that evidence might be lost if they delay; the imminent danger that evidence will be destroyed through delay must be actual and specific. (*People* v. *Edwards* (1981) 126 Cal.App.3d 447, 457 [178 Cal.Rptr. 876].) In a proper case, the dissipation of alcohol in a suspect's bloodstream would seem to be a classic case of such destruction, since it proceeds inexorably as a function of time. In *Schmerber* v. *California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826], the Supreme Court recognized this fact in a different context: "The officer in the present [drunk driving] case . . . might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a [search] warrant, under the circumstances, threatened the 'destruction of evidence.' [Citation.] We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." (*Id.*, at p. 770 [16 L.Ed.2d at pp. 919-920].) *Schmerber* held that the automatic elimination of alcohol from the bloodstream amounts to the destruction of evidence such that, in

proper cases, a suspect's blood-alcohol level may be tested without first obtaining a search warrant. (See also *People* v. *Huber* (1965) 232 Cal.App.2d 663 [43 Cal.Rptr. 65][1] [recognizing that the taking of a blood sample is the only means of protecting blood-alcohol content from destruction and preserving it for presentation to the court].)

■ The biological fact that blood-alcohol content decreases with time would not in itself justify warrantless entry into the homes of persons suspected of felony driving offenses, since not all such offenses are due to drinking or proven by evidence of drinking, and not all drunk drivers proceed immediately to their homes. In order to justify an entry on this basis, the police would have to have probable cause to believe that the suspect was under the influence, that he has committed a felony of which being under the influence of alcohol is an element, and that he is presently at home. In addition, the time interval between the offense and the entry must be brief enough so that evidence of drinking would still remain in the blood. Without the concurrence of these four factors, the possibility of losing evidence of guilt through delay would be too speculative to justify a nonconsensual intrusion into a private residence.[2]

■ The test is met in the present case.

First, the officer who entered defendant's home knew that the driver compartment of the van involved in the accident smelled strongly of alcohol, that a witness had seen the driver stagger, and that no apparent cause—other than intoxication—accounted for the accident. He therefore had probable cause to believe that the driver was under the influence.

Second, the officer testified that he believed the driver had committed a violation of Vehicle Code section 23101, one of the elements of which is being under the influence of alcohol. In view of the condition of the van, the victim, and the accident scene, this belief was adequately supported in fact.

Third, at the time the entry was made, the officer had probable cause to believe that the driver was within. The officer testified that he initially knocked on the defendant's door in order to ascertain whether anyone inside

---

[1]Disapproved on another ground in *People* v. *Superior Court* (*Hawkins*) (1972) 6 Cal.3d 757 [100 Cal.Rptr. 281, 493 P.2d 1145].

[2]We do not reach the question of whether the concurrence of these four factors would be enough to justify such a grave intrusion if it were shown that the ability to preserve evidence of blood-alcohol content would not be significantly impaired during the time necessary to obtain a telephonic arrest warrant. This question was neither presented to, nor addressed by, the trial court.

had seen the driver of the van parked in the adjacent driveway. Defendant's wife responded to the knock, and stated that the van belonged to her and her husband. She herself showed no sign of being under the influence. At that point, in view of the recency of the accident, the indications that the driver was visibly intoxicated, and a witness's description of the driver as a male, the officer had cause to believe that the husband was the driver. Further, since he knew that his colleagues had observed more than one person looking out of the window of appellant's home shortly before, he was entitled to believe that the husband was inside, notwithstanding the wife's contrary claim.

Finally, since only one and one-half hours had elapsed between the accident and the entry, evidence of the driver's blood-alcohol level was clearly still retrievable.

Under this combination of circumstances, we think that the officer was proven to be faced with an emergency situation requiring quick action to forestall the imminent destruction of evidence of a felony, and we uphold the warrantless entry on that ground.

## II

At trial, defendant produced several witnesses who had participated in experiments conducted by defense counsel. In these experiments, defendant had stood at the same spot on Beverly Glen Boulevard where the van driver had been standing at the time Credle saw him. The witnesses stood near the spot from which Credle had made his observation. Each witness testified that he or she was unable to recognize defendant's features, or to identify him at all, under these conditions, and remained unable to do so upon moving closer to defendant. ■ Defendant now argues that this testimony showed that Credle could not have identified him on the night of the accident and that the evidence was therefore insufficient to support his conviction.

We first note that Credle's identification of defendant was not the only evidence tending to prove guilt. Defendant was tentatively identified by a second eyewitness, who picked out his photograph from a mug folder as the one most resembling the driver. The van that hit Ms. Todo belonged to defendant, and was driven into defendant's driveway shortly after the accident. Defendant was found at home shortly after the van was first seen to be parked there. The driver had staggered as if he had been drinking; defendant was highly intoxicated after the accident, and testified that he had been drinking all evening.

Secondly, the jury was not bound to conclude that Credle could not have identified appellant. ■ Purported weaknesses in identification testimony

are to be evaluated by the jury (*People* v. *Fagalilo* (1981) 123 Cal.App.3d 524 [176 Cal.Rptr. 698]) and the testimony of a single eyewitness, if not inherently incredible, is sufficient to support a verdict. (*People* v. *Jackson* (1960) 183 Cal.App.2d 562 [6 Cal.Rptr. 884].) ▉ Here, the fact that several defense witnesses could not identify appellant does not render Credle's testimony inherently incredible. The jurors could have concluded that Credle's eyesight was more acute than the norm, and/or that the ability of a second prosecution witness to identify defendant lent credence to Credle's claimed ability to do so.

If defendant was not the driver during the accident, then two prosecution witnesses were mistaken in their identifications, the unknown person who took the van thoughtfully returned it to its owner's doorstep before vanishing, and defendant's high degree of intoxication was completely coincidental. The evidence was sufficient to allow a rational trier of fact to reject those possibilities and to find that defendant was the driver beyond a reasonable doubt.

## III

▉ Defendant next contends that the trial court erred in denying his motion to allow the jury to view the scene of the accident. (Pen. Code, § 1119.) He argues that such a view would have been the most accurate means of showing the jury whether Mr. Credle could or could not have identified him at the scene, a question that was crucial to the defense.

▉ The granting or denial of a jury view rests within the sound discretion of the trial court. In exercising that discretion, the court may consider whether the conditions to be viewed by the jury are the same as those which were perceived by witnesses to the crime. (*People* v. *Mooring* (1982) 129 Cal.App.3d 453 [181 Cal.Rptr. 71].) If the conditions are different, the motion may properly be denied. (*Id.*) Further, where the motion is made for the purpose of allowing the jury to assess the accuracy of a disputed identification, the trial court may deny it if there are other means of acquainting the jury with the physical conditions under which the identification was made. (*People* v. *Burciago* (1978) 81 Cal.App.3d 151 [146 Cal.Rptr. 236].)

▉ Under this authority, the court was within its discretion here. Among its reasons for denying the motion, the court cited its concern that the condition of the moon and clouds (and hence visibility) would likely differ from the time of the accident. In lieu of going to the accident scene, the jury heard six witnesses who testified to their inability to identify defendant at that scene under conditions similar and more favorable to those

described by Credle. An astronomer gave the jury a detailed description of the visibility conditions extant at the time and place of the crime. Thus, the court was well within its discretion to find that the jury was adequately equipped to evaluate the identification evidence without the necessity of being brought to the scene themselves.

## IV

After a few days of deliberating, the jury returned with guilty verdicts in counts II and III and the following question with respect to count I: "If we do not reach a unanimous decision on the issue of ordinary versus gross negligence, does that mean we have not reached a verdict on the manslaughter charge? Is the majority vote acceptable on this one issue?" Upon being questioned by the court, the foreman indicated that although the jury was in agreement that the evidence showed "at least ordinary negligence" as defined in the manslaughter instructions, they disagreed as to whether the negligence was ordinary or gross.[3] The court thereupon asked each juror whether he or she was "convinced beyond a reasonable doubt that the defendant is guilty of at least ordinary negligence." Upon receiving 12 affirmative answers, the court declared defendant "guilty of manslaughter, ordinary negligence" and discharged the jury. The minute order recording these proceedings shows a conviction of Penal Code section 192, subdivision 3(a), i.e., manslaughter committed with gross negligence.[4]

Defendant now challenges the judgment of conviction in count I, requiring us to resolve two issues: (1) Did the jury return a verdict of manslaughter as defined in section 192, subdivision 3(a)?; and (2) did the jury return a verdict of manslaughter at all?

The first issue is, by far, the easiest. The record clearly shows, and the Attorney General concedes, that the jurors never agreed on the heightened degree of negligence requisite to conviction of section 192, subdivision 3(a). Absent defendant's waiver of a jury determination of this issue, the court had no power to determine it itself. Moreover, inasmuch as the court declared defendant guilty of "manslaughter, *ordinary* negligence," we think

---

[3]Manslaughter committed with gross negligence constitutes a violation of Penal Code section 192, subdivision 3(a) and is punishable by a maximum term of three years in prison. Manslaughter committed with "ordinary" negligence constitutes a violation of Penal Code section 192, subdivision 3(b) and is punishable as a misdemeanor. (See Pen. Code, §§ 18, 193.)

[4]No abstract of judgment appears in the record on appeal or the superior court file. We take judicial notice, however, of a "Report—Indeterminate Sentence, other sentence choice," dated the same date as defendant's sentencing hearing and contained in the superior court file, which likewise shows a conviction of section 192, subdivision 3(a).

that the court did not even mean to find defendant guilty of the type of vehicular manslaughter proven by gross negligence.

The second issue requires more discussion. No verdict form was returned on count I. ▮▮ In order to convict a defendant, the jury need not formalize its verdict in writing (*People* v. *Lankford* (1976) 55 Cal.App.3d 203, 211 [127 Cal.Rptr. 408]), but its intent to convict must be "unmistakably expressed." (*People* v. *Savala* (1969) 2 Cal.App.3d 415, 419 [82 Cal.Rptr. 467]; *People* v. *DeArkland* (1968) 262 Cal.App.2d 802, 818-819 [69 Cal.Rptr. 144].) ▮▮ In the instant case, it is a close question whether the jury unmistakably expressed an intention to convict defendant of manslaughter.

In other cases, the requisite intent has been found by a jury's acknowledgment that the defendant is guilty of a particular count without making reference to the crime named in that count, or guilty of a particular crime without making reference to the count charging that crime. (See, e.g., *People* v. *McKinney* (1945) 71 Cal.App.2d 5 [161 P.2d 957]; *People* v. *Fisher* (1948) 86 Cal.App.2d 24 [194 P.2d 116]; *Stalcup* v. *Superior Court* (1972) 24 Cal.App.3d 932 [101 Cal.Rptr. 467].) To our knowledge, no lesser expression of jury intent has ever been held to suffice.

Here, the jury never acknowledged that defendant was guilty of manslaughter, or of the crime charged in count I. We therefore look to the record to see whether what the jury *did* say is equivalent to such an acknowledgment.

First, as the Attorney General points out, the jurors stated that defendant had committed negligence in a context which indicates a probability that they had already found him guilty of manslaughter. The jurors had been instructed that if they found defendant guilty of manslaughter, they must also find whether the act causing death was done with or without gross negligence. Thus, if the jury applied the instructions in logical order, they reached a decision on manslaughter before tackling the question of the degree of negligence.

Second, the jury stated that defendant was guilty of felony driving under the influence as charged in count III, a conviction which, on the instructions given, required findings that defendant had caused a death while driving in an unlawful manner. Thus, in its decision on count III the jury showed that it had made the factual findings that would justify a conviction of manslaughter.[5]

---

[5]Manslaughter may be proven by the unlawful killing of a human being in the driving of a vehicle, in the commission of an unlawful act. (Pen. Code, § 192, subd. 3(b).)

Taking these two manifestations of jury intent into account, we find it highly probable that the jurors had already agreed that defendant was guilty of manslaughter before they returned with their inquiry on negligence. However, we cannot say they did so for certain. Although juries are presumed to follow the instructions they are given, this jury was not instructed to postpone the question of defendant's degree of negligence until his guilt of manslaughter was unanimously determined. It therefore requires some speculation on our part to say that they did so. It is possible that the jury moved on to discuss negligence upon finding themselves with one or two dissenters or abstainers on the threshold question of defendant's guilt of manslaughter.

Our degree of certainty is enhanced, however, upon consideration of the verdict in count III, since any juror who found defendant guilty of felony driving under the influence would have no plausible reason to avoid reaching the only logical legal conclusion which is to find him guilty of manslaughter as well. However, this analysis would require us to assume that the jury did in fact take the extra step of reaching that legal conclusion and intending it to represent their verdict in count I. This we cannot do, for two reasons, both having to do with the right of criminal defendants to have the ultimate legal conclusion of their guilt stated by a jury regardless of how inescapable that conclusion may appear to be.

First, a jury's factual finding which admits of no legal conclusion other than guilt is not equivalent to a verdict of guilt, and cannot be treated as such unless the jury abdicates its responsibility to the court. Thus, in *People* v. *Beamon* (1973) 8 Cal.3d 625 [105 Cal.Rptr. 681, 504 P.2d 905], the jury's finding that the defendant was armed with a deadly weapon while committing robbery was held not to constitute a verdict of first degree robbery (a crime then defined as, inter alia, robbery committed while armed with a deadly weapon), inasmuch as the jury had stopped short of fixing the degree. In *People* v. *Bratis* (1977) 73 Cal.App.3d 751 [141 Cal.Rptr. 45], a special verdict which found true every fact requisite to guilt but which failed to declare the defendant guilty was found sufficient to support conviction only because the record indicated that the jury itself intended to abdicate its ultimate responsibility and give the question of guilt or innocence to the court to resolve. (See Pen. Code, §§ 1150, 1152, allowing juries in some instances to abdicate in this manner.)

Second, a jury's verdict with respect to one count can have no bearing upon the meaning or validity of the verdict in other counts, regardless of how similar the facts underlying each count may be. (Pen. Code, § 954.)[6] As stated in *People* v. *Amick* (1942) 20 Cal.2d 247, 251-252 [125

---

[6]Section 954 provides in pertinent part: "An acquittal of one or more counts shall not be deemed an acquittal of any other count."

P.2d 25], "[The] language [of Pen. Code, § 954] clearly means that each count in an indictment or information, which charges a separate and distinct offense must stand upon its own merit, and that a *verdict of either conviction or acquittal upon one such charge has no effect or bearing upon other separate counts which are contained therein.* . . . There are no authorities to the contrary in other jurisdictions where a statute exists similar to [Pen. Code, § 954]." (Quoting *People* v. *Ranney* (1932) 123 Cal.App. 403 [11 P.2d 405]; Accord, *People* v. *Witzel* (1957) 155 Cal.App.2d 486, 489 [318 P.2d 136]; italics added.)

The rationale of all these authorities is that a defendant accused of a crime has the right to a verdict rendered by human beings, who by their nature sometimes choose to base their ultimate decisions on compromise, mercy, or even stupidity as the case may be. In cases where the facts found true by the jury admit to but one legal conclusion, our system still allows the jury to either reach that conclusion or not, as they see fit. More, our system *requires* that the ultimate decision be left to the jury.

In the present case, we would have to resort to some speculation to conclude that the jurors reached the ultimate conclusion to find defendant guilty of manslaughter. Probably they did, or if not, probably they would have if allowed to deliberate further. These probabilities are not enough. The defendant was entitled not only to factual findings supporting his guilt, but to the unmistakable expression of a unanimous jury that it in fact had found him guilty. Since he did not receive that ultimate verdict, his manslaughter conviction must be reversed.

The judgment on count I is reversed. The judgment on counts II and III is affirmed. The matter is remanded to the trial court for resentencing.

Amerian, J., and Lucas, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.