Filed 7/20/22  P. v. Calderon CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID R. CALDERON et al.,<br><br>    Defendants and Appellants. | D078988<br><br><br>(Super. Ct. Nos. FSB19003784, FSB19003785) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael A. Smith, Judge.  Affirmed, with corrections.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant David Calderon.

Rex Adam Williams, under appointment by the Court of Appeal, for Defendant and Appellant Nick Simon Calderon.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Meredith S. White, Deputy Attorneys General, for the Plaintiff and Respondent.

A jury convicted David R. Calderon and Nick Simon Calderon[1] of second degree murder in the death of Michael R. The trial court reduced the count to manslaughter and sentenced the defendants to 25 years to life and 11 years, respectively. It did not award presentence custody credits to David.

David and Nick contend there was not sufficient evidence to find them guilty of manslaughter. David also contends the court erred in refusing to calculate presentence good conduct credits.

We conclude substantial evidence supports the convictions in this matter, and we accordingly affirm. However, the trial court erred in its calculation of presentence custody credits for David, and we will correct that error.

I.

BACKGROUND AND PROCEDURAL FACTS

On April 2, 2016, at around 2:07 a.m., video footage from an AM/PM market captured Michael R. entering with Tyria K. Michael and Tyria had a short conversation at the cash register, after which Tyria left, and Michael followed. Tyria got into a white Chevrolet Suburban with a broken front driver's window and left with the driver. Michael returned to the store, then left and walked through the lot. He was seen on video carrying a small folding knife with a brass knuckle.

Tyria later told police she was at the AM/PM with Michael because he was supposed to withdraw $20 to pay an outstanding drug debt, but he did not withdraw the money, so she left.

---

1    Because the co-defendants share a surname, we use their first names for clarity.

Tyria and the driver went to the Terrace Motel, where she was staying with Karla A. When Tyria arrived at the Terrace Motel, she told Karla that Michael had pulled a knife on her; he had never done anything like that before.

Michael arrived at the Terrace Motel on foot, between 12 and 20 minutes after Tyria. Karla and Tyria let him in their room on the condition that he would give up his knife; he had already given his phone to Tyria. Michael used some drugs while he was in the motel room. When he left about 30 minutes after arriving, he took his knife, but Tyria kept his phone, which she was holding until he paid the money he owed her.

Michael was next seen on video footage around 4:30 a.m. at an Arco on the corner of Foothill and Meridian, about a quarter to a third of a mile away from where he was eventually found. Video from the Arco (the Arco video) showed a white sedan missing a left rear hubcap, with a trunk that did not close well, and tinted back windows pull up around 4:15 a.m. Two men exited the white sedan. One was wearing a gray shirt and a blue baseball cap, and he appeared to have something in his hands.

Michael walked up to the store counter carrying his knife. Michael exchanged looks or comments with the man in the gray shirt. The man in the gray shirt walked away, then returned a few seconds later with the taller man wearing all black, who made a hand motion and punched Michael to the ground. Michael got up and ran from the two men, losing a shoe as he retreated. The two men followed Michael as Michael backed away. At one point, Michael turned and ran around the gas pumps, then faced the two men and threw his arms out as if challenging them.

After Michael's exchange with the men, Michael ran eastbound on Foothill Boulevard from Arco around 4:16 a.m. The direction he ran would

3

allow someone to travel north on Meridian to Sixth Street, where a fight occurred a few minutes later. One of the men threw the shoe on the roof of the store, where it was later recovered by police. It matched a shoe later found near Michael's body.

San Bernardino Police Officer Manuel Valenzuela, who watched the Arco video, testified that he noticed something on the taller man's face, but he was not sure if it was a tattoo, birthmark, or some sort of facial hair. He also noted the second man had a tattoo of a woman's face on the left forearm.

Sergeant Nick Oldendorf, who was a detective at the time of the crime, testified that the exchange in the parking lot between Michael and the two men in the Arco video led police to believe the two men in the Arco video were suspects.

Around 4:25 a.m. Maria V. was asleep when shouting and the sounds of a fight awakened her. She heard someone calling for help, saying, "Mom," and "Help me." She looked out her window, which faced a neighbor's home, and she observed two Hispanic men hitting a third male, who was on the ground covering himself, in a fetal position. The fight happened to the right side of her driveway, under a street light, about four houses down from the intersection of Meridian and Sixth Street. She watched the two men punch and kick Michael. At one point, the taller man in black leaned against a truck parked to the left side of her driveway. He did nothing to stop the shorter man. Eventually, the shorter man walked over to the taller one, and they left on foot.

Maria described the taller perpetrator as wearing black pants and a black sweater. He had long, wavy hair and appeared to have a mustache. The day of the incident, she told police she estimated he was 18 to 25 years old and about 200 pounds. She believed he was around five feet eight inches

4

tall. The shorter perpetrator had on lighter clothes, shorts and a lighter gray T-shirt, with a baseball cap. He was chubbier than the taller man. She told police he was between five feet five inches and five feet eight inches tall, weighing around 230 pounds. She believed he was between 18 and 25 years old, and he had short hair. She compared his weight and height to the officer's.

On April 2, 2016, Maria told Officer Valenzuela that she did not recognize the suspects and would not recognize them if she saw them in the future. At trial, she testified that she saw the perpetrators' faces because the streetlight shone on their faces when they walked away from hitting Michael.[2]

Maria grabbed her phone to call 9-1-1, but she did not make the call because she saw a woman had gone outside to help Michael, and the fire department and paramedics arrived thereafter.[3]

Marilu G. lived with Maria and was in a bedroom with a window facing the street when she heard yelling around 4:25 a.m. and looked out her window. She saw two Hispanic males walking westbound from the area, and one looked down like he had dropped something before walking away. She told police the taller man was around six feet or six feet two inches tall and

---

[2]    The defense moved in limine to exclude any in-court identification of the defendants by Maria, and the prosecution conceded. The court directed the prosecution to instruct Maria not to make any in-court identification.

[3]    Maria testified at an earlier trial that she had watched the fight for just seconds. She also testified that the fire department showed up immediately after the woman appeared. At this retrial, she testified she watched the fight for about 20 minutes, and the fire department and paramedics arrived 10 to 15 minutes after the person appeared to help the victim.

200 pounds, wearing a dark shirt and dark pants.  She described the shorter man as five feet six inches to five feet eight inches and 230 pounds, with a white hooded sweatshirt and dark pants.  She placed both men around 18 to 25 years old.

Fernando R. testified he saw Michael in Karla's room at the Terrace Motel when he was delivering drugs.  Later, he went to his friend Sergio M.'s house, where he smoked methamphetamine in the garage.  Around 4:30 a.m., he sat in his car outside his friend's home, smoking marijuana.  He noticed an old, white, square car leaving the street in front of Sergio's home, heading in the direction of Meridian.  Paramedics arrived a few minutes after the white car left.

Sergio testified at trial that Fernando was at his house on April 2 for about five minutes, and the two smoked marijuana.

Officer Valenzuela arrived on scene after the fire department, at 4:44 a.m.  He observed Michael on the ground, bleeding profusely, with several lacerations to his neck area, upper back, and shoulders.  Officer Valenzuela tried to talk to Michael, but Michael could only gasp for air.  Michael died at the hospital.  The cause of death was homicide resulting from multiple sharp force injuries and loss of blood.

There was a large knife next to Michael, laying on the ground in blood, as well as a shoe.  A forensic specialist processed the crime scene, analyzing the knife for prints and collecting blood from the knife blade.  No usable latent impressions were recovered; no DNA evidence was introduced at trial.

On August 25, 2016, police distributed still images from the Arco video.  They received anonymous tips, including one which directed police to a location where the vehicle was kept.  Police also received anonymous tips

6

about who the assailants were, and they were at the same location as the vehicle.

Based on the tips, police surveilled 940 East Olive, in Colton. Around 4:00 p.m. on August 26, 2016, police officers observed a white sedan with tinted windows, a missing rear hubcap, and some trunk damage. Detective Albert Tello, who was participating in the surveillance, noted the vehicle matched the pictures captured from the video. A large Hispanic male exited the driver's seat and entered the residence with his wife, who had been in the passenger seat. When they exited the residence and drove off, police followed the vehicle and conducted a traffic stop. Police identified the driver as David. They executed a search warrant at the residence, where they recovered black Air Jordan shoes that appeared to match those worn by the suspect in the video footage from April 2.

In the picture of David taken on August 26, 2016, he had longer hair that was curlier at the ends, a small beard, and a mustache. He also had a large, visible face tattoo, which was covered by his mask at trial. When David was arrested, he was 33 years old, six feet tall, and he weighed 250 pounds.

On August 26, 2016, police showed Maria photographs of the two men who had been captured on the Arco video. Maria told them her daughter had shown her the pictures, and she had also seen them on the news. Maria told police the men in the video photographs were the two men she saw hitting Michael.

Police contacted Nick on September 6, 2016. Nick was between five-feet-eight and five feet nine inches tall and weighed around 200 to 215 pounds. He had a tattoo on his left forearm of a woman's face that Sergeant

Oldendorf said looked similar to the one he had seen on the shorter man in the Arco video.

The People initially charged David and Nick with first degree murder (Pen. Code,[4] § 187, subd. (a)). The matter proceeded to trial in August 2020, but the jury was unable to reach a unanimous verdict, and the trial court declared a mistrial. Fernando testified for the defense in court at the August 2020 trial.

The People retried the case three months later on a second degree murder theory. On November 2, 2020, Fernando was in custody on an unrelated case. While he was waiting to be transported, Fernando was placed in a waiting room with David. When Fernando moved to sit down next to David, David began swinging at him, saying, "You're a rat." Video of this incident was played at the retrial.

David's and Nick's attorneys focused on an identity defense. Among other things, they questioned Maria's testimony and pointed out inconsistencies in her testimony over time, as well as changes in other witnesses' testimony.

Following the retrial, the jury convicted both David and Nick of second degree murder.

David moved to set aside the verdict and grant a new trial. Nick moved to set aside the verdict and grant a new trial or, in the alternative, for modification of the verdict from murder to voluntary manslaughter.

The court explained there was sufficient evidence to demonstrate David and Nick were the individuals involved in the altercation at the Arco and that they were the men who attacked Michael a short distance away. It said it was "simply not reasonable" to "believe that [Michael] was involved in a

---

4       Further section references are to the Penal Code.

8

confrontation with the defendants at the [Arco], . . . but then two totally unrelated individuals, similar clothing, similar description, then met up with [Michael] and attacked him." Thus, it denied the motion for a new trial.

However, the court explained that Michael had acted in a belligerent and threatening manner at the Arco, that Michael did or said something to Nick in a threatening manner with the knife in his hands, and that conduct precipitated the initial confrontation with David and Nick. It concluded that David and Nick were acting under the influence of provocation and reduced the murder convictions to voluntary manslaughter (§ 192, subd. (a)).

At a bifurcated court trial, the court found true allegations that David had prior convictions for robbery (§ 211) and assault with a deadly weapon (§ 245, subd. (a)(1)). It sentenced David to 25 years to life, and it sentenced Nick to 11 years for manslaughter.

David and Nick timely appealed.

## II.

## DISCUSSION

### A. Sufficiency of the Evidence

David and Nick argue that there was insufficient evidence to prove that they are the two men in the Arco video, or that they are the men who attacked Michael in the street.

"The proper test to determine a claim of insufficient evidence in a criminal case is whether, on the entire record, a rational trier of fact could find [defendant] guilty beyond a reasonable doubt." (*People v. Barnes* (1986) 42 Cal.3d 284, 303.) "In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could

9

reasonably deduce from the evidence.' [Citations.] . . . . '[O]ur task . . . is twofold. First, we must resolve the issue in the light of the *whole record* . . . . Second, we must judge whether the evidence of each of the essential elements . . . is *substantial* . . . .' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576-577.) Substantial evidence in the criminal context is evidence that is "reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Id.* at p. 578.) The testimony of a single eye witness can be sufficient to support a verdict. (Evid. Code, § 411; *People v. Keltie* (1983) 148 Cal.App.3d 773, 781-782.) It is immaterial whether we would have drawn those same inferences (*People v. Solomon* (2010) 49 Cal.4th 792, 811-812); our job is not to reweigh the evidence or reevaluate witness credibility (*People v. Jones* (1990) 51 Cal.3d 294, 314). "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

### B. Identity of Men in the Arco Video

David and Nick note the prosecution did not establish who owned the vehicle seen in the Arco video or the one David was driving in August. They assert that absent that proof, a conclusion that David was the driver of the vehicle in the video would be pure speculation. And therefore, they claim, there is insufficient evidence to demonstrate David and his brother Nick were the two men in the Arco video.

The prosecution was not required to show vehicle ownership in order to establish the vehicle that appeared in the Arco video was the same one they pulled over while David was driving it. There was other, reasonable, credible

10

evidence from which a rational trier of fact could have concluded David and Nick were the two men in the Arco video.

The white sedan in the Arco video was missing a left rear hubcap, and it had a trunk that did not close well and tinted back windows. An anonymous caller who had seen the still images alerted police to the location of the white sedan. An anonymous caller also directed police to the address in Colton as belonging to at least one of the men seen in the video stills. The vehicle David was driving in August was, like the one in the Arco video, a white sedan with tinted windows that was missing a rear hubcap and had trunk damage. Police pulled over David only after they observed him enter and exit the address they were surveilling, and they noted the vehicle matched the images in the Arco video. Given this information, it is reasonable to infer that the person living at the address in Colton, who the caller told police was the person in the Arco video, was the same person as the one driving the similar white sedan to the same address.

Not only was there evidence connecting David to the person in the video and a vehicle matching the one seen in the video, but the search warrant executed on David's residence also uncovered a pair of shoes that matched those worn by one of the suspects in the video, and David—like the man in the video—had something visible on his face, a tattoo. Nick, likewise, matched the description of the person in the video; both had tattoos of a woman's face on their forearm, which Detective Oldendorf testified looked similar. Finally, we note that the jury could view David and Nick in person in the courtroom and draw its own comparisons between the defendants and the men in the Arco video to draw a conclusion.

Taken together and considered in the light most favorable to the judgment, a reasonable juror could conclude the similarities between the men

11

and the white sedan in the Arco video and David and Nick and the white sedan David was driving in August meant they were one and the same.

## C. Identification of Assailants at the Fight

David and Nick also contend there is insufficient evidence to prove the two people in the Arco video are the same people Maria saw attacking Michael in the street. David contends this identification relied entirely on Maria's testimony, and he maintains she was unreliable due to inconsistencies in her statements over time. Nick likewise contends Maria's testimony at trial lacked credibility, arguing her identification of the assailants was tainted by having seen the still photos from the Arco video before police shared them with her.

Maria initially told police she would not recognize the two assailants if she saw them again. But she gave descriptions of the men. She described a taller man in all black, with long, wavy hair, and a mustache. He seemed between 18 and 25 years old, about 200 pounds, and around five feet eight inches tall. This description was similar to the one Marilu gave of the two men walking away from the area after she had been awakened by yelling. Like Maria, Marilu identified one of the assailants as taller, around six feet or six feet two inches tall, wearing a dark shirt and dark pants. The witnesses' descriptions were consistent with the person in the Arco video and with David's appearance in August 2016. In August, David had longer hair that was curlier at the ends, a small beard and mustache, and he was six feet tall and weighed 250 pounds.

The description of the second assailant also matched the video images of the second assailant, Nick. Maria described him as shorter and wearing lighter clothes—shorts and a lighter gray T-shirt—with short hair and a baseball cap. She noted he was chubbier than the taller man, weighing

around 230 pounds, and he was between five foot five and five foot eight inches tall, around 18 to 25 years old. Marilu described the second assailant as shorter than the first, around five feet six inches to five feet eight inches. She thought he weighed about 230 pounds, and he was wearing a white hooded sweatshirt and dark pants. Although there are some small differences regarding height and weight and the color of the shorter assailant's shirt, which Maria said was lighter gray and Marilu said was white, those differences are minor. Their descriptions of the second assailant are broadly consistent with each other and similar to the images captured in the Arco video. The second man in the Arco video was shorter and appeared chubbier than the man in black, and he wore a gray shirt, like the man in the fight. Maria and Marilu's descriptions also bear strong similarities to Nick. Nick was between five foot eight and five foot nine inches tall at the time of his arrest. He weighed between 200 and 215 pounds, but because he was shorter than David, he appeared chubbier. Again, this is credible evidence that supports the verdict.

Maria's initial concern that she would not recognize the assailants if she saw them again does not make her identification speculative. Though she may initially have believed she would not recognize them if she saw them again, she also explained at trial that she saw the assailants' faces because the streetlight shone on them as they walked away from Michael. After police showed her the video stills, she told them the pictures were of the two men she saw hitting Michael. David and Nick suggest that Maria's initial comments and her viewing of the video stills before police shared them with her tainted her identification. But the jury was presented with information that Maria saw the still photos on the news, and that Maria's daughter showed her the photos before the police did. It was also presented with

13

information about Maria's statements to police.  It was up to the jury to assess Maria's credibility and to determine what weight, if any, it should award her identification of David and Nick as the assailants.  (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497; *People v. Allen* (1985) 165 Cal.App.3d 616, 623.)

The video showed David and Nick leaving the Arco parking lot at 4:25 a.m., moments before Maria and Marilu were awakened by the noise of the fight, right around the same time.  There was testimony that a white, square vehicle sped away from the scene of the fight shortly before the paramedics arrived.  As the trial court explained, it was reasonable to infer that the two men at the Arco, who matched the description of the assailants provided by Maria and Marilu and were seen in the vicinity near the time of the fight, were the same two men in the fight.  Finally, David's reaction to Fernando after the first trial, attacking him as a "rat" was additional evidence to support the claim that David was one of the assailants.  Taking this evidence in the light most favorable to the judgment, we conclude substantial evidence supports the judgments.

### D.  Presentence Credits

David contends the court erred by failing to award presentence credits, and the Attorney General agrees.

At sentencing, the trial court determined David had earned 1,605 credits, but it concluded he was not entitled to any conduct credits.  David moved to correct the error, and the trial court denied the request, citing section 2933.5.

Section 2933.5 provides that a person convicted of certain felony offenses who has previously been convicted twice or more and served two or more separate prior prison terms for offenses also listed within the provision

14

is ineligible to earn credit on the current term of imprisonment. (§ 2933.5, subd. (a).) Although David's current offense, manslaughter (§ 192, subd. (a)), is among the offenses ineligible to earn credit, his prior offenses of robbery (§ 211) and assault with a deadly weapon (§ 245, subd. (a)(1)) are not. (See § 2933.5, subds. (a)(1) & (2).) Thus, section 2933.5's limitations do not apply to David, and he should have been awarded presentence conduct credit.

When the current conviction is a violent felony as defined in section 667.5, presentence conduct credits are limited to 15 percent of the actual time. (See *People v. Thomas* (1999) 21 Cal.4th 1122, 1130; see also *People v. Philpot* (2004) 122 Cal.App.4th 893, 908.) Voluntary manslaughter is a violent felony. (See § 667.5, subd. (c)(1).) Accordingly, David's conduct credits cannot exceed 15 percent of his actual time in custody, pursuant to section 2933.1.

David was awarded 1,605 days of custody; thus, he is entitled to 240 days of conduct credit, or 1,845 days of credit. (See, e.g., *People v. Ramos* (1996) 50 Cal.App.4th 810, 815-816.) We are authorized to correct this error on appeal, and we will order the correction. (See *People v. Duran* (1998) 67 Cal.App.4th 267, 270.)

## DISPOSITION

The judgment against David Calderon is modified to reflect an award of 1,845 days of credit, comprised of 1,605 days of actual credit and 240 days of good conduct credit. The superior court is directed to prepare an amended abstract of judgment, which reflects the corrected award and to forward a

certified copy of the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


DO, J.

16