[Crim. No. 8422. First Dist., Div. Two. May 14, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN CLARENCE WILLIAMS, Defendant and Appellant.

## COUNSEL

Thomas H. Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Michael Buzzell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KANE, J.**—Defendant appeals from a judgment entered on a jury verdict convicting him of first degree murder.

On the afternoon of October 14, 1968, the deceased body of Edward Monaghan was discovered in the bedroom of his house trailer in Union City. He had last been seen alive by a neighbor at about midnight of the previous evening. His body was found with a necktie wrapped tightly around his neck, with electrical cords "about his neck and chest area," and with abrasions and lacerations on his head. The cause of death was asphyxiation due to strangulation.

Several items were discovered inside the trailer, including a film projector, several reels of movie film, a holster for a long-barreled revolver, and at least three hand vibrators or massagers. Bloodstains appeared on carpeting near the body, on a bedroom wall, on a bathroom sink, and on pieces of broken glass from a bathroom mirror.

Appellant first met Monaghan, whose nickname was Mike, at the beginning of summer 1968 and thereafter began selling pornographic films supplied to him by Monaghan. Appellant had met Lloyd Kolpack in April of the same year; Kolpack had accompanied appellant to Monaghan's trailer on at least two occasions during the summer.

At trial Kolpack testified that one evening in late September or early October 1968, appellant told him "that he was pretty mad" at "Mike" and "that he was going to snuff him out." Kolpack stated that appellant also said that Mike "carried large sums of money" and asked Kolpack to accompany him. Kolpack also testified that about a week later appellant told him "that he had taken a woman down there to turn a trick, and that Mike wanted to use a device on her, and she refused, and he didn't pay for it." Kolpack stated that appellant said the device was a vibrator; appellant's description of the incident indicated to Kolpack that he was mad at Mike. Kolpack said appellant also showed him chloral hydrate pills and told him "They could put anybody down, or to sleep. . . ."

Kolpack had introduced appellant to Robert Carson in July 1968. At trial Carson testified that one evening in the middle or end of September 1968, appellant asked him whether he had any poison or drugs and that when Carson asked why he cared, appellant "said he had this fellow that he wanted to put out of the way for a while." Carson said that appellant described the person as "a way-out pervert" who "couldn't make it as far as the sex act with a woman, so he used a hand massager on her." Carson said appellant told him that getting rid of this person "would be worth a

good deal of money to him" and mentioned the figures of $1,500 and $2,500. Carson also testified that five days or a week later appellant again mentioned "getting rid of this person."

On October 10 or 11, 1968, appellant met Anthony Van Buskirk at the latter's cabin located near Sonora. He was introduced by Joanne Reed, an occupant of the cabin. At trial Van Buskirk testified that the following events occurred on the evening of October 13:

He drove with appellant to a trailer located in Union City, where appellant was to make a deal for films. Van Buskirk was asleep when they arrived and waited in the car while appellant entered the trailer. Later he entered the trailer to use the bathroom, during which time he picked a piece of broken mirror out of the sink. He returned to the car, fell asleep and they arrived back near Sonora early the next morning, on October 14.

Later that morning Van Buskirk observed appellant in possession of a gray attache case and a .357 magnum revolver; on October 17 or 18, he observed appellant in possession of a .22 caliber revolver, ammunition belt and holster. Both revolvers and the attache case were later identified as having belonged to Monaghan. On October 15, appellant, Joanne Reed and Van Buskirk traveled to Sacramento, where appellant sold several reels of film and still photographs to the proprietor of a pharmacy. The films and photos were later identified as having belonged to Monaghan.

Van Buskirk also testified that on October 27 appellant and Joanne Reed left his cabin after informing him that they were wanted for murder. Van Buskirk said they took the .357 magnum revolver with them but left the .22 caliber revolver at the cabin. Appellant's vehicle was stopped in Sacramento on October 28, and the .357 magnum revolver was found, fully loaded, beneath appellant's seat.

Van Buskirk was also charged with the murder of Monaghan,[1] tried by a jury and acquitted. He testified at the present trial that while he was in jail with appellant in May 1969, appellant told him to get rid of the .22 caliber revolver because he had used it to hit Monaghan over the head in the trailer. Van Buskirk stated that appellant told him Monaghan drew the gun during an argument, that it discharged, creating a concussion which broke the bathroom mirror, and that the blow to Monaghan's head knocked him out but left him still breathing.

Other evidence at trial revealed that traces of human blood were found

---

[1]Van Buskirk and appellant were accused in the same information, but their cases were severed pursuant to appellant's motion.

inside the hammer slot of the .22 caliber revolver, a fragment of a bullet was discovered imbedded in a closet wall in the trailer, and Van Buskirk's palmprints and fingerprints were found on pieces of broken mirror in the bathroom and his fingerprint was found on a piece of broken mirror on the bedroom nightstand.

Appellant testified and denied ever striking, strangling or killing Monaghan. He admitted knowing Monaghan, Kolpack, Carson and Van Buskirk, but denied ever making the statements described by the last three. He admitted introducing Joanne Reed to Monaghan, with whom he said she performed an act of prostitution for payment, and observing Monaghan in possession of hand massagers, for which he considered Monaghan "fairly weird" and a "weird person."

Appellant also admitted having driven from Sonora to Monaghan's trailer to pick up film he had already arranged to sell to the Sacramento pharmacist. But he testified that this trip occurred on the evening of October 11, that Van Buskirk and two of appellant's children accompanied him, and that they arrived at the trailer around midnight. Appellant said he conferred with Monaghan for a half-hour to an hour, received a gray attache case from him filled with films and still photos and purchased the .357 magnum revolver from him. Appellant denied taking the .22 caliber revolver. He said that Van Buskirk entered the trailer and remained a short time. Appellant said they arrived back in Sonora at daybreak on October 12 and denied ever returning to the Hayward area.

### Search of Appellant's Vehicle

Appellant's motion to suppress evidence obtained from the search of his vehicle was denied after a hearing. On appeal he relies upon four arguments to contend that "the motion to suppress respecting the .357 magnum revolver should have been granted":[2]

*Argument 1.—Reasonable Cause.* ██ Appellant contends that the arresting officers did not have sufficient information to arrest him without a warrant. We do not agree. The arresting officer had received a description of appellant's vehicle, including its make, year, color and license number, and of its likely occupants, an armed white male and a white female, both wanted for murder. This information was furnished by a Union City police officer, who had learned shortly after the murder that appellant and Monaghan knew each other, that an old blue car was seen parked in front of

---

[2] Appellant also contends that evidence of his statement respecting the weapon "should not have been admitted because it was a product of appellant's illegal arrest." In addition to the reasons we set forth upholding the search of the vehicle, it should be noted that appellant did not object to the admission of his statement.

Monaghan's trailer a few weeks before the murder, that telephone calls were made from Monaghan's telephone to appellant in the Sonora area, that appellant owned a blue 1962 vehicle, that a person known to associate with appellant (Carson) reported that appellant had referred to using drugs or poison to do in a sex pervert who used a massager on girls, that Monaghan was known to have engaged in such practice, and that another of appellant's associates (Kolpack) reported that appellant had referred to killing Monaghan and had requested his assistance.

This information could reasonably raise an honest and strong suspicion of appellant's guilt. The fact that the statements of appellant's associates related to "future intent rather than a confession or admission of past accomplished acts" is not determinative in view of the other corroborating information; nor does appellant support with authority his argument that such statements are necessarily inadequate. As for the reliability of the informants, the officers learned from the Tuolumne County Sheriff's Department that although Kolpack was "considered a police problem," Carson was performing as an informer and "had provided them with reliable information in the past."

Thus, we hold that the information relied upon by the officers to arrest appellant without a warrant was sufficient. (*Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 664, 666 [87 Cal.Rptr. 202, 470 P.2d 11]; *People* v. *Hall* (1971) 3 Cal.3d 992, 997 [92 Cal.Rptr. 304, 479 P.2d 664]; *People* v. *Madden* (1970) 2 Cal.3d 1017, 1021 [88 Cal.Rptr. 171, 471 P.2d 971]; *People* v. *Terry* (1970) 2 Cal.3d 362, 393-394 [85 Cal.Rptr. 409, 466 P.2d 961]; Pen. Code, § 836.)[3]

*Argument 2.—Failure to obtain arrest warrant.* Appellant argues that the investigating officer had time to apply for an arrest warrant and that the failure to do so vitiates the warrantless arrest.

Appellant concedes the absence of any direct authority to support his argument. He relies, by analogy, upon *Jackson* v. *Superior Court* (1950) 98 Cal.App.2d 183 [219 P.2d 879]. The analogy is misplaced.

In *Jackson,* an officer observed a misdemeanor being committed in his presence, cautioned the offender to stop, and then left the scene. The officer then went about other unrelated duties and did not effect the arrest until 28 hours later.

---

[3]Two recent decisions, one from the United States Supreme Court (*Whiteley* v. *Warden,* 401 U.S. 560 [28 L.Ed.2d 306, 91 S.Ct. 1031]), and the other from the California Supreme Court (*People* v. *Fein* (1971) 4 Cal.3d 747 [94 Cal.Rptr. 607, 484 P.2d 583]), are factually distinguishable and therefore do not require a different result here.

An officer's authority to make a warrantless arrest for a misdemeanor is governed by Penal Code section 836, subdivision 1, which provides: "Whenever he has reasonable cause to believe that the person to be arrested has committed a public offense *in his presence.*" (Italics added.)

The rationale of *Jackson* in holding the arrest invalid was that an arrest for a misdemeanor not reasonably contemporaneously with its commission is not, in fact, an arrest made for an offense committed in his presence. In other words, the statutory basis for the arrest has evaporated. (See Witkin, Cal. Criminal Procedure (1963), § 105, p. 104.) That this was the basis of the *Jackson* ruling is readily apparent from its quotation of the rule expressed in *People* v. *Craig,* 152 Cal. 42, 47 [91 P. 997]:

" 'It seems to be generally held that an arrest for a *misdemeanor* without a warrant cannot be justified if made after the occasion has passed, though committed in the presence of the arresting officer.' " (*Jackson* v. *Superior Court, supra,* at p. 185; italics added.)

■ The statutory authority to make a warrantless *felony* arrest by a peace officer is set forth in Penal Code section 836, subdivisions 2 and 3:

"2. When a person arrested has committed a felony, although not in his presence.

"3. Whenever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed."

In neither section is there any requirement that suggests a time limitation on a felony arrest. The right to make a felony arrest is not dependent upon its being committed in the officer's presence. The statute impliedly recognizes the obvious fact that most felonies will not occur in the presence of an officer and that protection of society against serious crimes is better served by granting a broader basis for felony arrests than for misdemeanor offenses.

Thus, the only conditions imposed upon the validity of a warrantless felony arrest are (1) that a felony was in fact committed, or (2) that the officer had reasonable cause to believe a felony had been committed.

■ We have pointed out above that the officers had sufficient information to make a warrantless arrest. It follows, therefore, that there was no requirement to obtain an arrest warrant even assuming, *arguendo,* that they had time to request one from a court.

*Argument 3.—Refusal of request to inspect the first teletype bulletin.*
■ Two teletype bulletins were issued by the Union City police. The first,

issued on October 22, 1968, was superseded by the second on October 24, 1968. The arresting officers acted upon the second teletype and it was received in evidence at the 1538.5 hearing.

Defense counsel's request to have the first teletype produced and marked for identification was denied.

The ruling of the court was correct. The arresting officers—as pointed out above—did not rely upon or utilize the first teletype; consequently the contents of that document were not relevant on the motion to suppress issues.

*Argument 4.—Identity of arrestees.* ■ Conceding that the arresting officers were justified in the detention and patdown search of himself and his female companion, appellant contends that since the officers did not know the names of the persons to be arrested, they had no basis on which to assume that appellant and the female were the persons named in the teletype.

This argument is totally without merit. The arrestees closely fit the description of the persons mentioned, and were apprehended in the vehicle described, in the teletype bulletin. The arrest was proper.

### Prosecution Witness Ordered Called By Court

■ Van Buskirk was called as a witness by the prosecution, pursuant to the trial court's order. Although no objection was raised by defense counsel at trial, appellant now contends that the court lacked authority to make such an order, that it abused its discretion by ordering testimony likely to be "highly untrustworthy," and that its failure to give sufficient cautionary instructions and explanations of its order resulted in its departure from "the role of mere referee. . . ." These arguments are also without merit.

The authority of a trial court to call and examine witnesses under Evidence Code section 775 has been found to extend to witnesses called by the court but placed on the stand by a party. (*People* v. *Murray* (1970) 11 Cal.App.3d 880, 884-885 [90 Cal.Rptr. 84]; *Travis* v. *Southern Pacific Co.* (1962) 210 Cal.App.2d 410, 424 [26 Cal.Rptr. 700].) As a result of such procedure, the party placing the witness might be denied the right to cross-examination afforded "all parties" by section 775, but appellant was not denied such right in the present case. (Cf. *People* v. *Murray, supra,* 11 Cal.App.3d at pp. 883-884.)

Nor was Van Buskirk's testimony so likely to be untrustworthy as to

render the court's action an abuse of discretion. The reluctance, if any, of the prosecution to call Van Buskirk as a witness does not necessarily indicate that his testimony was considered untrustworthy. Additionally, there is no indication in the record that the court was fully aware of the nature of Van Buskirk's testimony, since the judge merely stated that the prosecuting attorney had informed him about "a witness who has information which may or may not affect the outcome of this case" and had discovered new evidence. Later the judge indicated his desire "to give the jury and the Court the benefit of all testimony."

Moreover, Van Buskirk was subjected to thorough cross-examination by defense counsel regarding the circumstances under which he offered to testify.

Finally, the court provided ample precautions against any possible untrustworthy testimony by Van Buskirk. Shortly after completion of Van Buskirk's testimony on rebuttal, the court informed the jury that the prosecution had been instructed to call Van Buskirk as a witness in order to provide them with all information respecting the case, whether favorable to the prosecution or defense, and that the jury was "not to regard that in any way as to what the Court may feel about the case in any way whatsoever." Later the court repeated these factors during instructions to the jury, and further instructed that Van Buskirk's "testimony ought to be viewed with distrust" and given the weight to which it is entitled "after examining it with care and caution. . . ." That these precautions afforded ample protection is further shown by the failure of defense counsel to object to Van Buskirk's testimony.

### Testimony by Witness Scott

■ Van Buskirk testified that prison inmate Scott refused to testify about a confession he heard appellant make to Van Buskirk because Scott feared appellant. Appellant called Scott as a witness to impeach this testimony. Scott testified that Van Buskirk had in fact asked him to testify with respect to a conversation he was supposed to have overheard, "in which Mr. Williams [appellant] confessed guilt in this case," but denied ever hearing such a conversation or refusing to testify out of fear of appellant. Scott said he refused because the alleged conversation "wasn't the truth."

The court sustained an objection to defense counsel's request that Scott relate what Van Buskirk asked him to testify about, stating that the "exact conversation" constituted hearsay. While this ruling was technically incorrect, no prejudice is shown to have resulted. The record demonstrates, and appellant acknowledges, that Scott amply impeached Van Buskirk's testi-

mony. Therefore, appellant's argument that the ruling prevented Van Buskirk's testimony from being "further impeached" is of no real significance.

■ As to the impeachment of Scott by reference to his felony conviction, appellant acknowledges that inquiries about the name, place and date of each conviction are proper under *People* v. *Smith* (1966) 63 Cal.2d 779, 790 [48 Cal.Rptr. 382, 409 P.2d 222], but alleges that any inquiry about the punishment imposed is prohibited by *People* v. *Butler* (1967) 65 Cal.2d 569, 575 [55 Cal.Rptr. 511, 421 P.2d 703]. Although this may be true as a general rule, the elicitation from Scott in the present case of the fact that probation was imposed for three of his convictions rendered any error harmless. That he was currently incarcerated had already been elicited on direct examination by defense counsel.

### Felony-Murder Instruction Based On Robbery

■ Appellant contends the record did not contain sufficient evidence to justify giving a felony-murder instruction based on robbery and that the instruction given contained error. These contentions are invalid.

■ A killing "committed in either the perpetration of or an attempt to perpetrate robbery" constitutes first degree murder "whether the killing is wilfull, deliberate and premeditated, or merely accidental or unintentional, and whether or not the killing is planned as a part of the commission of the robbery." (*People* v. *Stamp* (1969) 2 Cal.App.3d 203, 209 [82 Cal. Rptr. 598], hg. den., cert. den. 400 U.S. 819 [27 L.Ed.2d 46, 91 S.Ct. 36].) Moreover, "no intentional act is necessary other than the attempt to or the actual commission of the robbery itself." (*Ibid.*, p. 210.)

■ Several factors support the theory that appellant entered Monaghan's trailer planning to commit robbery. Kolpack testified that appellant told him that snuffing out Monaghan would be worthwhile since he "carried large sums of money." Carson testified that appellant told him that getting rid of Monaghan "would be worth a good deal of money to him" and mentioned the sums of $1,500 and $2,500. Van Buskirk testified that he observed appellant in possession of Monaghan's attache case filled with films and two of his revolvers. Van Buskirk also stated that appellant admitted striking Monaghan on the head during an argument. Evidence was introduced that Monaghan normally carried large amounts of cash in his billfold and that he collected various denominations of coins. The Sacramento pharmacist testified that appellant exchanged rolls of coins worth $50 to $60 for currency. This evidence warranted giving the instruction.

■ Nor did the instruction contain errors. Appellant complains that a portion of an instruction on manslaughter created an impression that

commission of any felony activated the felony-murder rule regardless of causation. The court had previously given a complete definition of the rule during instructions on murder, including the need to find that the killing was "a direct causal result of the perpetration or attempt to perpetrate a felony inherently dangerous to human life." The court had thereafter listed specific crimes which support first degree felony-murder and discussed robbery specifically. In these circumstances, it is inconceivable that the jury would receive the impression suggested by appellant, especially with respect to felony murder based upon robbery.

█ Finally, appellant contends that the court—although not requested to do so—should have instructed *sua sponte* that the felony-murder rule could not apply unless the intent to rob preceded the attack on Monaghan, citing *People* v. *Gonzales* (1967) 66 Cal.2d 482 [58 Cal.Rptr. 361, 426 P.2d 929]; *People* v. *Carnine* (1953) 41 Cal.2d 384, 388-389 [260 P.2d 16], and *People* v. *Jeter* (1964) 60 Cal.2d 671, 676-677 [36 Cal. Rptr. 323, 388 P.2d 355]. The defendant in each of those cases, however, admitted killing and robbing the victim and relied on the defense that the intent to rob arose after the fact of homicide.

At no time during this trial did appellant rely on the theory to which such an instruction would have been applicable. On the contrary, appellant denied either assaulting or robbing Monaghan; he repudiated the only evidence even remotely suggesting that the robbery might have occurred after an assault, i.e., Van Buskirk's testimony that appellant admitted striking Monaghan after an argument arose. Consequently, the court "was not required to give an instruction that would have had no foundation in the evidence or in any theory on which the case was tried." (*People* v. *Carter* (1957) 48 Cal.2d 737, 758 [312 P.2d 665]).

### Delayed Trial

█ The information against appellant was filed on January 27, 1969; he waived his right to be tried within 60 days thereof on February 7, and withdrew this waiver on May 5. Penal Code section 1382 entitled appellant to be tried within 10 days after May 5, absent a showing of good cause for delay. (*People* v. *Wilson* (1963) 60 Cal.2d 139, 145 [32 Cal.Rptr. 44, 383 P.2d 452].) His trial ultimately commenced on July 17.

Appellant's two motions to dismiss charges on account of delayed trial were denied. He acknowledges that his failure to file writs of mandate from such denials requires him on appeal to show that prejudice resulted from the delay. (*People* v. *Wilson, supra,* 60 Cal.2d at pp. 151, 154.) The only prejudice asserted by appellant is that the delay enabled Van Buskirk to be tried first, to be acquitted and gain immunity from the murder charge,

and thus to be able to testify against appellant. However, the reason Van Buskirk was tried separately was the granting of appellant's own motion to sever his case from Van Buskirk's. Additionally, no prejudice has been shown.

### Prosecution Misconduct

Appellant asserts several areas of alleged misconduct on the part of the prosecutor. We have concluded from an examination of the record that these assertions, taken singly or collectively, do not amount to prejudicial misconduct; nor do they warrant any detailed discussion. Nothing out of the ordinary scope of legitimate advocacy has been shown. Suffice it to say that the conduct of counsel was observed by the trial judge and noted in the record to have been exemplary.

### Additional Points Of Claimed Error

Finally, appellant points to certain rulings and/or action of the court as being "improper." Here, again we find no basis in the record to support appellant's claims.

The judgment is affirmed.

Shoemaker, P. J., and Taylor, J., concurred.

A petition for a rehearing was denied June 11, 1971, and appellant's petition for a hearing by the Supreme Court was denied July 7, 1971.