[No. A019829. First Dist., Div. Three. Jan. 25, 1985.]

THE PEOPLE, Plaintiff and Appellant, v.
SHERRY STEPHANIE HAMPTON, Defendant and Respondent.

COUNSEL

John K. Van de Kamp, Attorney General, Ronald E. Niver and J. Patrick Collins, Deputy Attorneys General, for Plaintiff and Appellant.

William Bernstein and Mulholland, Bernstein & Peterson for Defendant and Respondent.

OPINION

**SCOTT, J.**—Respondent Sherry Stephanie Hampton was charged with possession of cocaine, driving under the influence of alcohol, driving with 0.10 percent blood alcohol, and resisting a public officer in performing his duties. After her motion to suppress evidence was granted, the trial court dismissed the information pursuant to Penal Code section 1385, and the People have appealed. We reverse.

I

Respondent was stopped in her car on March 27, 1982, at about 4:30 a.m. by Officer John Eubanks. She appeared to be intoxicated. Since she was only about two blocks from home, Eubanks offered her the opportunity to be driven home. Although she insisted that she wanted to continue her search for her boyfriend, and expressed concern that her car might be stolen if she left it in the parking lot, she eventually accepted the officer's offer.

Eubanks locked respondent's car and kept what respondent said were her only keys, which he promised to return to her in the morning. He drove her to her apartment and walked her to her door. She went inside; he returned to his patrol car and drove to a nearby service station. A few minutes later, he resumed his patrol, and saw respondent's car leaving the parking lot. The driver appeared to be a long-haired female, and Eubanks believed it was respondent.

Eubanks pursued the vehicle, but lost sight of it as it entered the parking lot of respondent's apartment complex. He found the car parked in the stall for respondent's apartment; its hood felt warm. He heard a door slam in the direction of respondent's apartment.

Officer Eubanks quickly went to respondent's apartment and knocked on the door. She opened the door, apparently more intoxicated than before. When asked how her car came to be parked back at the apartment, respon-

dent stated that she had driven it home to prevent its theft. The officer then put his hand on hers, told her she was under arrest, and asked her to step outside. She pulled back into the apartment and Officer Eubanks followed, trying to keep his balance.

Respondent struggled as the officer tried to handcuff her. She called for her roommate, Richard Burrows, who came into the room with a gun. He dropped the gun when Officer Eubanks let respondent go and identified himself.

While Officer Eubanks explained to Burrows that respondent was being arrested for drunk driving, respondent ran into her bedroom. A second officer arrived. Ultimately respondent was taken to jail; during a booking search there, a vial containing powder later determined to be cocaine was found in her pocket.

Respondent moved to suppress the evidence on the grounds that (1) the warrantless misdemeanor arrest was improper because it occurred too long after the offense was committed in the officer's presence; and (2) there were no exigent circumstances justifying the arrest in her home. The People urged that the arrest was justified both under the "hot pursuit" doctrine and to prevent the destruction of evidence. The trial court granted the motion, primarily because it concluded that the "hot pursuit" doctrine was inapplicable to a misdemeanor arrest.

## II

First, the People urge that the officer made the arrest within a reasonable time after he observed the commission of the drunk driving offense. We agree.

An officer's authority to make a warrantless arrest for a misdemeanor is governed by Penal Code section 836, subdivision 1, which provides that an officer may arrest a person without a warrant "[w]henever he has reasonable cause to believe that the person to be arrested has committed a public offense in his presence." Such an arrest must be made at the time of the offense or within a reasonable time thereafter. (*Jackson* v. *Superior Court* (1950) 98 Cal.App.2d 183, 185 [219 P.2d 879].) In other words, if the arrest is not made "reasonably contemporaneously" with the commission of the offense, "the statutory basis for the arrest has evaporated." (*People* v. *Williams* (1971) 17 Cal.App.3d 554, 562 [95 Cal.Rptr. 234].) In *Jackson*, for example, a deputy sheriff observed a youth destroying public property early one afternoon, but did not attempt to arrest him for the offense until late the next day. By then, the court held, the officer's right to

make a warrantless arrest for the offense had ceased. (*Jackson* v. *Superior Court, supra,* 98 Cal.App.2d at pp. 184-188.)

In this case, after the officer initially stopped respondent, he locked her car in the Dandy Market parking lot, and drove her home. In less than 15 minutes, he saw a woman whom he believed to be respondent, driving the car again. He followed and found the car in the rear parking area of her apartment building; he heard a door slam in the direction of respondent's apartment, and "quickly trotted, almost ran" to her door. Less than two minutes passed between the time he saw the car drive out of the Dandy Market lot and the time that he knocked on respondent's door. The arrest was unquestionably made within a reasonable time after the offense was committed in his presence.

### III

Whether respondent's warrantless arrest was constitutionally valid presents a more difficult question. Nevertheless, we conclude that the arrest was proper.

### A

The Fourth Amendment to the federal Constitution and article I, section 13 of the California Constitution prohibit a warrantless arrest in a suspect's home, absent exigent circumstances. (*Payton* v. *New York* (1980) 445 U.S. 573, 576-583 [63 L.Ed.2d 639, 644-649, 100 S.Ct. 1371]; *People* v. *Ramey* (1976) 16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333].) "In this context, 'exigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case,the claim of an extraordinary situation must be measured by the facts known to the officers." (*Id.,* at p. 276.)

First, the People assume arguendo that the arrest occurred inside respondent's home and rely on *People* v. *Keltie* (1983) 148 Cal.App.3d 773 [196 Cal.Rptr. 243] to urge that the entry was justified by the need to preserve blood alcohol evidence. In *Keltie,* a person was struck and killed by a vehicle. No one saw the accident, but witnesses who heard the impact saw defendant's van at the scene and saw him stagger and then drive away. An hour later, police found the van parked in defendant's driveway; the driver's compartment smelled strongly of alcohol, and the side of the van was smeared with blood. Without a warrant, officers entered defendant's

home, found him visibly intoxicated, and arrested him for felony drunk driving. (*Id.*, at pp. 778-781.)

The appellate court upheld the warrantless entry. Initially, it rejected the argument that the arrest was necessary to prevent an imminent escape. This "hot pursuit" exception applies where the delay occasioned by obtaining a warrant would permit the escape of one suspected of a grave offense, who remains " 'dangerous to life and limb.' " A person suspected of an alcohol-related offense poses no imminent danger, the court reasoned, once he is separated from his vehicle. (*Id.*, at p. 779.)

However, the court then concluded that the arrest was justified by the need to preserve the blood-alcohol evidence, which dissipates from the bloodstream "inexorably as a function of time." (*Id.*, at pp. 779-781.) The court limited its holding by declaring that in order to justify an arrest on this basis, "the police would have to have probable cause to believe that the suspect was under the influence, that he has committed a felony of which being under the influence of alcohol is an element, and that he is presently at home. In addition, the time interval between the offense and the entry must be brief enough so that evidence of drinking would still remain in the blood." (*Id.*, at p. 780.)

Respondent urges that *Keltie* is not controlling, because this case involves a misdemeanor, not a felony. Respondent argues that a warrantless arrest in a home for a misdemeanor can never be justified. As we will explain, we disagree.

In *Welsh* v. *Wisconsin* (1984) 466 U.S. 740 [80 L.Ed.2d 732, 104 S.Ct. 2091], the Supreme Court considered whether and under what circumstances the Fourth Amendment prohibits the warrantless entry of a person's home to arrest him or her for a nonfelony. In *Welsh,* a witness observed a car swerve off a Wisconsin road and stop in an open field. The driver emerged, and after a brief conversation with the witness, walked away. Police arrived. The witness reported what he had seen and said that the driver was either very inebriated or sick. From a registration check, police discovered that the car's owner lived a short distance away. Without a warrant they went to his home, gained entry, found him in bed, and arrested him for driving under the influence of an intoxicant. In Wisconsin, a first offense for driving under the influence was then a noncriminal violation; an offender was subject only to a civil forfeiture proceeding with a maximum fine of $200. (At pp. —— [80 L.Ed.2d at pp. 738-740, 104 S.Ct. at pp. 2093-2095].)

The Supreme Court held that this warrantless entry was constitutionally invalid. In so holding, the court declared that the gravity of the underlying

offense is an "important factor" to be considered when determining whether any exigency exists. It pointed out that several states have refused to permit warrantless home arrests for nonfelonious crimes[1] and stated that application of the exigent-circumstances exception in the context of a home entry should "rarely" be sanctioned when the underlying offense is only a "minor offense" such as that at issue in the case. (*Welsh* v. *Wisconsin, supra,* 466 U.S. at pp. —— [80 L.Ed.2d 742-746, 104 S.Ct. 2091 at pp. 2097-2100].) Nevertheless, the court did not proclaim an absolute rule that such a warrantless arrest for a nonfelony can never be justified.[2]

Holding the Wisconsin arrest invalid, the *Welsh* court first rejected the state's attempt to justify the arrest according to the "hot pursuit" doctrine by noting that there had been no immediate or continuous pursuit of the suspect from the scene of the crime. Moreover, because the driver had arrived home and had abandoned his car at the scene of the accident, the court concluded that there was little remaining threat to the public safety. (*Welsh* v. *Wisconsin, supra,* 466 U.S. at p. — [80 L.Ed.2d at pp. 745-746, 104 S.Ct. at pp. 2099-2100].)

The only remaining potential exigency claimed by the state was the need to ascertain the suspect's blood-alcohol level, but the court rejected this justification as well. It focused on Wisconsin's classification of a first offense for driving while intoxicated as a noncriminal, civil forfeiture offense for which no imprisonment is possible. (*Welsh* v. *Wisconsin, supra,* 466 U.S. at pp. —— [80 L.Ed.2d at pp. 745-746, 104 S.Ct. at pp. 2099-2100].) The penalty which attaches to an offense, the court explained, is the "clearest and most consistent indication" of the state's interest in arresting individuals suspected of committing that offense and is an indication which can be easily identified both by the courts and by officers faced with a decision to arrest. (At p. — [80 L.Ed.2d at p. 746, 104 S.Ct. at p. 2100].)

---

[1]But see *State* v. *Penas* (1978) 200 Neb. 387 [263 N.W.2d 835]; *State* v. *Niedermeyer* (1980) 48 Ore.App. 665 [617 P.2d 911]).

[2]The United States Supreme Court recently held that a person subjected to custodial interrogation is entitled to *Miranda* warnings whether the offense being investigated is a felony or a misdemeanor. The court reasoned that police are often unaware when they arrest a person whether he has committed a felony or a misdemeanor. The nature of an offense may depend on circumstances unknowable to police at the time, such as whether the suspect has previously committed a similar offense; it may depend on events yet to happen, such as whether the victim of an accident dies. It would be unreasonable to expect police to make guesses as to the nature of the criminal conduct at issue before deciding how they may interrogate a suspect. (*Berkemer* v. *McCarty* (1984) — U.S. —, — [82 L.Ed.2d 317, 329, 104 S.Ct. 3138].) The court's discussion in *Berkemer* further undercuts respondent's argument that there is such a clear line between felonies and misdemeanors that a warrantless entry to arrest for a misdemeanor is always prohibited and never justified by exigent circumstances.

The court declared that it did not mean to suggest that the prevention of drunk driving was not properly of "major concern" to the states. However, as Wisconsin had expressed its interest in arresting first offenders by choosing to limit severely the penalties which might be imposed on such offenders, the arrest could not be upheld simply because evidence of blood-alcohol might have been dissipated while police obtained a warrant. (*Welsh* v. *Wisconsin, supra,* 466 U.S. at p. — [80 L.Ed.2d at p. 745, 104 S.Ct. at p. 2100].) Concurring, Justice Blackmun emphasized his deep concern with what he perceived to be the nation's unwillingness to do something about drunk drivers and expressed amazement that Wisconsin still classifies a first offense of driving while intoxicated as a civil violation. (At pp. —— [80 L.Ed.2d at pp. 746-747, 104 S.Ct. at pp. 2100-2101].)

California, however, is not so lenient on those who drink and drive. The penalty which attaches to a first conviction of drunk driving in this state indicates that California has a far greater interest in arresting persons suspected of committing such an offense than does Wisconsin. A first offense of driving under the influence in this state is a criminal offense; at the time of respondent's arrest, the penalty for a first offense was imprisonment in the county jail for between four days and six months and a fine of between $390 and $500. (Veh. Code, § 23160, as amended by Stats. 1982, ch. 331, § 4, pp. 1632-1633.) In addition, a first offender's driver's license was subject to suspension for six months. (*Ibid.*) In addition to this legislative expression of California's strong interest in arresting and prosecuting drunk drivers, our Supreme Court itself has declared its resolve "to support 'all possible means of deterring persons from driving automobiles after drinking . . .' [citations] . . . ." (*Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 155 [181 Cal.Rptr. 784, 642 P.2d 1305].)

In this case, as in *People* v. *Keltie, supra,* 148 Cal.App.3d 773, the officer had probable cause to believe that respondent was under the influence of alcohol, that she had committed an offense of which being under the influence is an element, and that she was presently at home. In addition, the time interval between the offense and the entry was so brief that alcohol evidence would undoubtedly still have remained in her blood. (*Id.,* at p. 780.) In light of *Welsh* and the differences between California and Wisconsin law, we consider the fact that the offense was a misdemeanor rather than a felony as of no significance and conclude that the warrantless entry was justified to prevent the dissipation or destruction of evidence.

In addition, and regardless of the evidence preservation justification, the entry in this case was necessary to prevent imminent danger to life or serious damage to property. As we have discussed, in *Welsh* v. *Wisconsin, supra,* 466 U.S. 740, the court held that the arrest could not be justified on

that basis. However, the facts in this case are significantly different from those in *Welsh.* In that case, there was no "hot pursuit." The police did not see defendant's accident; their first encounter with him was in his bedroom. In contrast, in this case, after observing the person whom he believed to be respondent driving for the second time, the officer followed the car to her apartment building and went to her apartment; respondent herself answered his knock. In *Welsh,* immediately prior to the arrest there was little threat to the public safety, because the driver had abandoned his car in a field and had gone home to bed. In contrast, in this case, after the officer locked respondent's car, pocketed her keys, and drove her home, she apparently returned to the car with other keys and drove again. Earlier, she had insisted that she wanted to continue to search for her boyfriend. Thus even though respondent was separated from her car by the time of her arrest, the officer had good reason to believe that the separation might only be temporary and that she might start driving again. In fact, he testified that one of the reasons he didn't stop to obtain an arrest warrant was because he felt it more than likely that she would continue to get in her vehicle and drive and that her safety and the safety of others would thereby be threatened. Given her previous behavior, his concern was reasonable, and the gravity of her offense and the imminent danger she posed to life and property cannot be questioned. As the California Supreme Court has recently stated, "[t]he drunk driver cuts a wide swath of death, pain, grief, and untold physical and emotional injury across the roads of California and the nation." In that court's words, the risk posed by those who drink and drive is "horrific." (*Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 262 [198 Cal.Rptr. 145, 673 P.2d 732].)

Under these circumstances, assuming arguendo that the arrest did not occur until after the officer entered respondent's apartment, the entry to arrest was justified on the theory of hot pursuit.

**B**

As we have stated, the previous discussion is based on the assumption that the officer did not arrest respondent until after he entered her apartment. However, the facts suggest that we also consider the rule that the warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment. (*United States* v. *Watson* (1976) 423 U.S. 411, 414-424 [46 L.Ed.2d 598, 603-609, 96 S.Ct. 820].)

In *United States* v. *Santana* (1976) 427 U.S. 38 [49 L.Ed.2d 300, 96 S.Ct. 2406], police had probable cause to arrest a woman whom they saw standing in the open doorway of her home. As they approached shouting "police," she retreated into the vestibule; they followed through the open

door and arrested her. (At pp. 40-41 [49 L.Ed.2d at p. 304].) First, the court held that when the officers initially tried to arrest the woman on the threshold of her dwelling, she was in a "public place" for purposes of Fourth Amendment analysis. She "was not in an area where she had any expectation of privacy . . . . She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." (At p. 42 [49 L.Ed.2d at p. 305]; see also *United States* v. *Botero* (9th Cir. 1978) 589 F.2d 430 [in response to DEA agents' knock, defendant opens door and is arrested; no warrantless entry issue, as agents did not enter to arrest]; *United States* v. *Mason* (5th Cir. 1981) 661 F.2d 45 [arrest at door of home permissible]; 2 La Fave, Search and Seizure (1984 supp.) § 6.1, at pp. 136-137 ["And if the person to be arrested personally answers the door and places himself in a position where he can be and is arrested without entry of the premises, no warrant is required for the simple reason that there has been no entry of private premises at all." (Fns. omitted.)].)

Next, the *Santana* court held that the officers' "hot pursuit" of the woman into the vestibule was proper. The attempt to arrest had been "set in motion in a public place" and was therefore proper, and the suspect could not defeat the arrest by the expedient of escaping into the house. (*United States* v. *Santana, supra,* 427 U.S. at pp. 42-43 [49 L.Ed.2d at p. 305].)

The People now argue that the facts of this case are similar to those in *Santana.* At the hearing on the motion to suppress, the People urged the "hot pursuit" justification, but seemed to overlook the argument that the arrest was actually set in motion in a public place, as in *Santana.* Nevertheless, it appears to be undisputed that respondent was standing on the threshold when the officer placed her under arrest. Officer Eubanks testified that he told respondent that she was under arrest while she was standing at the open door of her apartment. In her memorandum in support of her suppression motion, respondent herself sets forth the facts as follows: "Ms. Hampton answered the door, and Officer Eubanks . . . then put his hand on top of hers and attempted to place her under arrest. Ms. Hampton pulled back into the apartment and Officer Eubanks stepped inside." Therefore, this is an even stronger case than *Santana*; here respondent was actually placed under arrest while at the threshold, i.e., in a public place, whereas in *Santana* the police merely "set in motion" the arrest (by shouting "police") while the defendant was in a public place.

We need not decide, however, whether application of the *Santana* analysis to the facts of this case is a new theory which cannot be raised for the first time on appeal, as we have concluded that even if the arrest did not occur

until the officer was well inside the apartment, his entry and the arrest were justified by exigent circumstances.

The order of dismissal is reversed.

Barry-Deal, J., concurred.

**WHITE, P. J.**—I respectfully dissent.

If the purpose of the Fourth Amendment's prohibition of "unreasonable" searches and seizures is to safeguard the privacy and security of individuals against arbitrary invasions by government officials, respondent Hampton's nonconsensual warrantless, forcible, nighttime arrest was assuredly unconstitutional. Upon review of the entire evidence adduced at the section 1538.5[1] suppression hearing, it is readily apparent that this court is presented with a seizure reasonable at its inception that became an *unreasonable* exercise of police discretion within the meaning of both the Fourth Amendment of the United States Constitution and article I, section 13 of the California Constitution. (*Payton* v. *New York* (1980) 445 U.S. 573, 586 [63 L.Ed.2d 639, 651, 100 S.Ct. 1371]; *People* v. *Ramey* (1976) 16 Cal.3d 267, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333].) Moreover, I am satisfied that this record clearly demonstrates that any asserted exigency or urgent necessity allegedly justifying Officer Eubanks' ultimate decision to bypass the magistrate's warrant foreseeably resulted from his arbitrary decision confining respondent to her own quarters.

For as long as memory serves me I have understood that characteristically our society affords the police officer "wide discretion on matters dealing with the daily lives of citizens. . . ."[2] However, for several reasons Officer

---

[1] Unless otherwise designated all statutory references are to the California Penal Code.

[2] "It is often overlooked that no public officials in the entire range of modern government are given such wide discretion on matters dealing with the daily lives of citizens as are police officers. In the broad terms of public administration, I think it would be a safe assumption that the scope of discretion enlarges as we look upward in the hierarchy of government. In other words, the higher the rank, the greater is the discretion. But this is not true in police work. The policeman on the beat, or in the patrol car, makes more decisions and exercises broader discretion affecting the daily lives of people, every day and to a greater extent, in many respects, than a judge will ordinarily exercise in a week. . . ." Excerpted from 1981 FBI Academy graduation address by the Chief Justice of the United States, Warren E. Burger; see ABA Standards Relating to the Administration of Criminal Justice, Compilation page 8 (1984). See also 1 Crime and Justice, an Annual Review of Research (1979) edited by Howard Morris and Michael Tomey for nostalgic reading recalling the contribution of influential writers (including J. Goldstein 1960; LaFave 1965; and Davis 1969) during the neocivil rights struggle on the structural basis and seminal significance of police discretion. Sociologists R. Rumbant and E. Bittner at page 292 observed: "Indeed, the officer claimed even greater power than the magistrate, for the officer could exonerate solely on the basis of his own view of the facts and judgment, and without expla-

Eubanks' decision initially not to formally arrest and jail respondent for driving while intoxicated I find to be unreasonable. His decision might, of course, be simply viewed as an example of the police officer's "wide discretion" occurring daily which commonly escapes the judiciary's scrutiny. However, such rationalization ignores that in this case the Fourth Amendment became relevant the moment Officer Eubanks decided to restrain respondent's operation of her vehicle. "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." (*Terry* v. *Ohio* (1967) 392 U.S. 1, at p. 16 [20 L.Ed.2d 889, at p. 903, 88 S.Ct. 1868].)

In this case there can be no question that Officer Eubanks' investigative stop or "seizure" of respondent was at its inception objectively reasonable, i.e., the facts available to the officer at the moment of the vehicle stop resulting in respondent's seizure would warrant a person of reasonable caution in the belief that the action taken was appropriate. It is also clear that thereafter he reasonably conducted his investigation generating probable cause to arrest for "drunk driving." I hold that thereafter it was Officer Eubanks' plain duty to place respondent under custodial arrest ushering her off to jail.

Technically he actually placed her under *custodial* arrest. At page 30 of the reporter's transcript, Officer Eubanks testified that he originally stopped respondent at "04:37" a.m. and left her at her apartment at ". . . approximately 0500." Further as to respondent's status during that half hour, the officer testified, at line 20, "[s]he was in custody until 5:00 o'clock." Clearly if, during that half hour, Officer Eubanks had conducted or authorized a full blown body or "jailhouse" search of respondent revealing the contraband cocaine, Fourth Amendment law would uphold the search and seizure as incident to lawful arrest. (*United States* v. *Robinson* (1973) 414 U.S. 218, 235 [38 L.Ed.2d 427, 440, 94 S.Ct. 467].) Section 834 defines in relevant part an "arrest" as simply ". . . taking a person into custody. . . ." Section 849 commands a peace officer that an arrestee "shall, without unnecessary delay, be taken before the nearest or most accessible magis-

---

nation, while the judge could do so—in the very same case—only in accordance with rules of procedure and fact finding and in open court. As Goldstein, LaFave, and Davis saw it, the freedom to decide in police work resulted—in large part—from a variety of inadvertent and deliberate ambiguities and omissions in the way statutes and regulations are drafted, exacerbated by the absence of explicitly formulated law enforcement policies. Because of these shortcomings the police officer had to supply what—had it come from a more exalted functionary—would have been called jurisprudential policy. He had also to incorporate administrative considerations into his decision making from case to case."

trate, if not otherwise released. . . ." Section 849, subdivision (b) states the conditions under which a warrantless arrestee may be released by a peace officer short of "a trip to the station house."[3] From my reading of the statute it is clear that Officer Eubanks' decision releasing respondent to be confined at her "house" until he returned her car keys after 8:00 o'clock was at best contrary to public policy as expressed by the Legislature.

At worst his decision to "give a break," so to speak, to respondent violated her statutory right to be taken before the magistrate. I hold that his placement of respondent under house detention in order to *sober up* before he permitted her to drive to work in the morning was both constitutionally unreasonable and a violation of the statutory law of arrest. The only reason of record for not taking respondent to jail is that she was only "two blocks" from home when stopped. Clearly such reasoning does not satisfy the objectively reasonable or prudent person constitutional standard. I don't question that Officer Eubanks was *well-intentioned,* but it is imperative that the facts underlying his failure to take respondent before the magistrate be judged by this court against an objective standard. For my part, I am unable to conceive a constitutional analysis justifying his action as either reasonable or lawful.

I don't address the question as to whether respondent's violation of the implicit terms of her own recognizance (O.R.) or house detention attenuated the taint of the officer's "illegal" conduct so that her subsequent warrantless "house" arrest was not tainted "fruit of the poisonous tree." I find it sufficient that in any Fourth Amendment analysis of the facts in this case it clearly appears that Officer Eubanks' unreasonable, if not illegal, conduct must fairly be viewed as a concurrent, if not the efficient, cause of what my colleagues find to be "exigent circumstances." (See maj. opn. at p. 30.) It was reasonably foreseeable to Officer Eubanks that respondent would not in

---

[3]California Penal Code section 849 states: "(a) When an arrest is made without a warrant by a peace officer or private person, the person arrested, if not otherwise released, shall, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the offense is triable, and a complaint stating the charge against the arrested person shall be laid before such magistrate. [¶] (b) Any peace officer may release from custody, instead of taking such person before a magistrate, any person arrested without a warrant whenever: [¶] (1) He is satisfied that there are insufficient grounds for making a criminal complaint against the person arrested. [¶] (2) The person arrested was arrested for intoxication only, and no further proceedings are desirable. [¶] (3) The person was arrested only for being under the influence of a narcotic, drug, or restricted dangerous drug and such person is delivered to a facility or hospital for treatment and no further proceedings are desirable. [¶] Any record of arrest of a person released pursuant to paragraphs (1) and (3) of subdivision (b) shall include a record of release. Thereafter, such arrest shall not be deemed an arrest, but a detention only." (See also Veh. Code, § 40302.)

fact retire as contemplated by him.[4] In light of that *foreseeability,* I hold that on this record any claimed exigent circumstances excusing the warrant requirement, if suffered to be heard, is less than the *real, genuine* or *bona fide emergency* required by the constitutions, federal and state. "Where genuine exigencies exist, broad constitutional mandates often give way to the necessity for immediate action, and an arrest is no exception to this rule. But in the absence of a bona fide emergency, or consent to enter, police action in seizing the individual in the home must be preceded by the judicial authorization of an arrest warrant." (*People* v. *Ramey, supra,* at p. 275.) It is my conclusion that Officer Eubanks' assertion of exigent circumstances[5] approaches if not contrivance or subterfuge, then certainly coverup.

---

[4]Before assenting to Officer Eubanks' offer, one that she couldn't reasonably refuse, she left no room for doubting her intentions to return to the scene of the crime, so to speak. Predictably she would not rest until her sport car was safely and securely parked in its allotted parking stall. Officer Eubanks testified that although she had not told him what she was going to do, after 15 minutes had elapsed he decided ". . . to patrol the area to make sure that Miss Hampton had not left her apartment on foot to continue looking for her boyfriend." His worst fears, of course, were soon to be realized. He testified that upon observing the vehicle leaving Dandy's Market parking lot where it had been left unattended, he suspected she was again driving. Then, he realized, apparently for the first time, as he testified, "[t]here was a reasonable likelihood she could have a second key to the vehicle. She was very much intent on her vehicle being driven home and not being left at Dandy's Market, for fear of being stolen. And she was very intent continue looking [*sic*] for her boyfriend."

Given Officer Eubanks' demonstrated negligence in the line of duty, the fact that there is no likelihood of a civil action because respondent suffered no proximately caused damages only attests to the fact that someone upstairs looks out for all of us alike. Any juror or judge called upon to decide the cases we review on the criminal side of the docket realizes that the officer in this case unwittingly set the stage for a scenario wherein respondent could have been the victim of civil personal injuries, violent crime, or auto theft.

[5]At the suppression hearing when questioned as to why he did not secure a warrant, Officer Eubanks testified as follows: "One is the evidence in drunk driving is blood alcohol level. To take the time to obtain an arrest warrant, the evidence would disappear, would be removed from the system of her body. [¶] Another reason is that I felt that being that her hand was outside the door, that that constituted enough of her being outside that I wouldn't need a search warrant. [¶] Another reason was hot pursuit. I was immediately behind her. And that was indicated by her opening the door immediately after I knocked on it. [¶] Another reason is that I felt if I turned around and walked away that it was more than likely that she would continue to get in her vehicle and drive. And her safety as well as safety of others would be, would be threatened by her driving around in this condition."

Apparently the majority would uphold this warrantless search on a theory of the facts that "respondent was actually placed under arrest while at the threshold, i.e., in a public place . . ." (see maj. opn. at p. 36) if the People had urged arrest in a public place to the court in the suppression hearing. It is my view that there is no question but that respondent was arrested in her private residence. Substantial evidence supports the trial court's implied finding that Officer Eubanks entered her apartment in order to arrest her at a time when she was at the door but standing inside her apartment. The officer pointedly testified that only her "wrist and hand area were on the door frame . . . outside or exterior to the threshold." He couldn't remember which hand; the remaining hand was holding the door knob. He demonstrated through the use of a courtroom door. The demonstration is not described in the record. Presumably respondent's door opened inward. With only one hand in the area of the door jamb, her feet were not on the threshold but inside her apartment. In any case

I would affirm the order excluding the contraband cocaine seized in this case. Because "[t]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed" (*United States* v. *United States District Court* (1972) 407 U.S. 297, 313 [32 L.Ed.2d 752, 764, 92 S.Ct. 2125]); and because a "'basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable[,]" (*Payton* v. *New York, supra,* 445 U.S. at p. 586 [63 L.Ed.2d at p. 651]) "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." (See *Welsh* v. *Wisconsin* (1984) 466 U.S. 740, at pp. 749-750 [80 L.Ed.2d 732, 743, 104 S.Ct. 2091], cited in maj. opn. at p. 32.) It is settled that Fourth Amendment search and seizure law is essentially a case-by-case analysis. In the case at bench when all the facts known to Officer Eubanks are measured objectively, his claim of an extraordinary or emergency situation places the "police" in an incongruous and untenable posture from which to carry its "heavy" burden. "When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequence if he postponed action to get a warrant." (Justice Jackson, concurring in *McDonald* v. *United States* (1948) 335 U.S. 451, at pp. 459-460 [93 L.Ed. 153, 161, 69 S.Ct. 191].) Here at bench, the "police" point to the consequence of losing evidence of blood alcohol level that fifteen minutes earlier they were unreasonably, and I think illegally, willing to have escape entirely the attention of the criminal justice system. I turn a deaf ear not only because the police's

---

the trial court's order suppressing the evidence expressly finds that the officer entered "accompanied by an intent to arrest . . ." albeit not a "known and clearly identified suspect." We are required to uphold the court's findings, express or implied, on review. (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

*United States* v. *Santana* (1976) 427 U.S. 38 [49 L.Ed.2d 300, 96 S.Ct. 2406], cited in the majority opinion at page 36, clearly, then, is not on point. Also we do not have under review a *Noia* v. *Cozens* (1973) 34 Cal.App.3d 691 [110 Cal.Rptr. 231] scene in which the vehicle driver is aware that he is being pursued by the officer. In the case at bench there is no evidence that Officer Eubanks flashed his high beams, blew his horn, or turned on his red lights as was the fact in *Noia* v. *Cozens, supra. Noia* was detained and arrested as he exited his garage, i.e., in a public place. The Attorney General's expressed fears that to disapprove this warrantless entry to arrest would give "drunk drivers a license to flee to the safety of their home" is sheer nonsense. *Noia* could not avoid arrest by the simple expedient of staying in his garage or home once he failed to heed the officer's signals to stop. Respondent, if the officer is to be believed, admitted she had moved her car; but, again, she was within her apartment and it is undisputed that Officer Eubanks did not alert her to his presence while he was driving from the market area to her home. We do not review a case of "hot pursuit" of a fleeing suspect.

Finally, Officer Eubanks' subjective belief that respondent would operate her vehicle a third time I hold to be unreasonable. She had already given him one key; there was no reason to conclude that she would not turn over the other key. In any case, her precious sport car was now safe. Finally, the officer had summoned a "back-up" who could have posted the apartment while a warrant was secured. In the final analysis the attendant inconvenience to the police was of their own hand.

predicament was foreseeably of his own making, but because "[t]he general need for and importance of a warrant, in regard to Fourth Amendment issues, is a doctrine of continuing and increasing vigor." (*Dorman* v. *United States* (App. D.C. 1970) 435 F.2d 385, 390.)

My colleagues conclude that the warrantless entry was justified to prevent the dissipation or destruction of the alcohol level of respondent's blood evidence. (See maj. opn. at p. 34.) I pointedly disagree because I read *Welsh* v. *Wisconsin, supra,* 466 U.S. 740 differently than does the majority. Actually my colleagues reach the same result as did Wisconsin's Supreme Court in *Welsh.* In reversing the Wisconsin court, our highest court pointed out that even if ". . . the underlying facts support a finding of exigent circumstances, mere similarity to other cases involving the imminent destruction of evidence is not sufficient." (*Id.,* at p. 754 [80 L.Ed.2d at pp. 745-746] A claim of alcohol-blood level evidence then is not a talisman or "sure fire" litmus test for "exigency" but only one factor to be considered in warrantless search and seizure law analysis.[6]

An important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made. (*Welsh, supra,* 466 U.S. 740.) Consequently, ". . . a finding of exigent circumstance to justify a warrantless home entry should be severely restricted when only a minor offense is committed." (*Welsh,* at p. 750 [80 L.Ed.2d at p. 744].)

Following what the "Burger" court in *Welsh* called a common sense approach, how then should driving while intoxicated be classified in the abstract in our state? It is a misdemeanor appearing in the Vehicle Code as an offense involving alcohol and drugs; but I agree that fact should not be the acid test. Our Legislature and consequently the courts have not treated the offense as being "grave." A first time offender need not go to jail if he or she accepts probation and a 90-day partial limiting restriction on their license to drive. There are, of course, grave or very serious alcohol and drug related offenses; but they are felonies as was the case in *People* v. *Keltie* (1983) 148 Cal.App.3d 773 [196 Cal.Rptr. 243], cited in the majority opinion at page 31.[7] The Legislature then, may be viewed as classifying the first

---

[6]Recently at the 1984 annual California Bench/Bar Association convention, Professor Charles Whitebread, University of Southern California Law School, lecturing on *Welsh* v. *Wisconsin, supra,* 466 U.S. 740, pointed out that the "Burger" court greatly prefers case by case jurisprudence; that it does not like to announce its decisions and rules, and indeed, in police cases has been dismantling many of the rules we already have. And although the "Burger" court is not just willing but eager to accommodate the needs of legitimate and effective law enforcement, it is still a court that imposes "some limits" on the police, the police must have a "serious reason" to justify a warrantless entry. Professor Whitebread concludes "This court is pretty scrupulous about protecting the privacy of one's own home."

[7]Keltie was charged with: (count I) vehicular manslaughter in violation of Penal Code section 192, subdivision 3(a); (count II) felony hit and run in violation of Vehicle Code section 20001; and (count III) felony driving under the influence in violation of Vehicle Code section 23101.

offense as a relatively minor one. But even a relatively minor offense may entail serious circumstances or consequences as we all too often painfully realize. I can only conclude that in the abstract a first offense of driving under the influence in this state is serious as is all crime; but presently it appears to be classified as relatively minor in the list of alcohol related driving offenses. In any case, again in the abstract, I would not think it serious enough on balance to outweigh the individual's privacy and security interest afforded by our constitutions sufficient to toll the death knell for the Fourth Amendment's warrant requirement. Manifestly, in the context of this case, the police, if Officer Eubanks is any judge, did not initially treat respondent's misdeed as being serious.

My colleagues are not "activists" but they do take a "giant step." I trail behind because (1) it is my view that whether the seriousness of the driving while intoxicated problem warrants a dimunition of California residents' privacy and security rights when inside their "house" is a policy question for the people through its Legislature; and (2) recognizing that courts do set policy, this case is not the vehicle to bring about the change my colleagues have wrought.

This case, in my view, is a classic for the "exclusionary rule." To exclude this evidence as illegally obtained is simply to announce and reaffirm that the police in the front line of the effort to maintain law and order have a duty to arrest indiscriminately upon reasonable or probable cause. Equality before the law by way of equal, indiscriminate enforcement and treatment is no less important or fundamental than any other constitutionally guaranteed right including due process. To exclude in this case deters the police conduct exhibited and maintains "the imperative of judicial integrity." The cost to society is nil when compared to the benefit, i.e., respect for the criminal justice system. I would withhold the constitutional imprimatur and affirm the order suppressing the evidence. Respondent's arrest only lacks a warrant to be lawful.

A petition for a rehearing was denied February 22, 1985. White, P. J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied April 18, 1985. Bird, C. J., Broussard, J., and Grodin, J., were of the opinion that the petition should be granted.